header number 1489

**Pedro DELGADO, Elia Gregorio, Marcelo Llanes and Marta R. Torres, Plaintiffs–Appellants,**

v.

**Jim SMITH, in his official capacity as Secretary of State of the State of Florida, and David Leahy, in his official capacity as the Supervisor of Elections of Dade County, Florida and as a representative of a defendant class of all County Supervisors of Elections in the State of Florida, Defendants–Appellees,**

and

**Florida English Campaign, U.S. English Legislative Task Force, Inc., and U.S. English Foundation, Inc., Intervenors–Appellees.**

No. 88–6068.

United States Court of Appeals, Eleventh Circuit.

Nov. 4, 1988.

Rehearing and Rehearing In Banc Denied Dec. 19, 1988.

---

Donald M. Middlebrooks, Steel, Hector & Davis, Steven A. Zalesin, Weil, Gotshal & Manges, Miami, Fla., for plaintiffs-appellants.

George L. Waas, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for Smith.

Murray Greenburg, Miami, Fla., for Leahy.

Mark A. Dienstag, Miami, Fla., for Florida English Campaign.

Before FAY and ANDERSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

FAY, Circuit Judge:

This is an expedited appeal from a federal district court judgment dismissing a complaint which sought to enjoin certain State of Florida officials from conducting an election on a citizen initiative to amend the state constitution planned for November 8, 1988. The proposed amendment to the Florida Constitution would make English the official language of the State of Florida. As required by Florida law, proponents of the amendment circulated a petition to gather signatures in support of placing the proposed amendment on the ballot. The issue on appeal is whether the circulation of the petition, written only in English, in designated bilingual political subdivisions violated § 203(c) of the Federal Voting Rights Act. The controlling provision of the Voting Rights Act requires a state which distributes "materials or information relating to the electoral process" to certain bilingual political subdivisions to provide them "in the language of the applicable language minority group as well as in the English language." 42 U.S.C.A. § 1973b(f)(4) (1981 & Supp.1988). Because we find that the Voting Rights Act does not apply to initiative petitions and the involvement by the state officials in the initiative process does not constitute state

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

action, we affirm the district court's denial of the injunction.

I. BACKGROUND

On October 11, 1988, the plaintiffs/appellants, four registered voters whose primary language is Spanish, filed a complaint in federal district court seeking declaratory and injunctive relief under the Voting Rights Act of 1965, 42 U.S.C.A. §§ 1971 et seq. (1981 & Supp.1988) ("Act"). The appellants sought to restrain the Secretary of State of Florida and the Supervisors of Elections of Florida from conducting a vote on a proposed constitutional amendment in an election planned for November 8, 1988.[1] The proposed amendment to the Florida Constitution (the "Official English Initiative") provides:

> (a) English is the official language of the state of Florida.
>
> (b) The Legislature shall have the power to enforce this section by appropriate legislation.

The Florida Constitution sets forth several methods for amending its provisions, including voter initiative. Citizens who wish to amend the constitution may initiate a petition and circulate it throughout the state gathering signatures in support of the amendment. If enough signatures are collected with the proper geographic distribution, the amendment will be placed on the general ballot for Florida voters' consideration. Fla.Const. art. XI, § 3. In addition to the signature requirements established by the Florida Constitution, various state statutes charge state officials with limited duties in the course of the initiative process.

For example, the Secretary of State must determine that the petition signatures meet the number and geographic distribution requirements, approve the form of the petition and submit it to the Attorney General of Florida specifying that the petition sponsors have fulfilled certain formal requirements. *See* Fla.Stat. §§ 100.371(4) & 15.21 (1987). Upon receiving the petition, the Attorney General of Florida must petition the Florida Supreme Court for an advisory opinion on whether the amendment addresses only one subject matter, as required by the state constitution, and whether the amendment's form and style meet specified requirements. Fla.Stat. § 16.061 (1987). Finally, the Florida Supervisors of Elections are charged with verifying and validating the petition's form and signatures. Fla.Stat. § 100.371(3) and (5) (1987). The district court found that the appellees fully complied with the prescribed state process to amend the constitution.

In complying with the prescribed procedure, the Official English Initiative sponsors circulated a petition written only in English to obtain the requisite number of signatures to put the amendment on the ballot. The appellants contend this circulation violated the Voting Rights Act section which provides that whenever a state subject to rules prohibiting discrimination against citizens of language minorities,:

> provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language....

42 U.S.C.A. § 1973aa–1a(c) (1981 & Supp. 1988). Florida has six counties identified under the Act as language minority political subdivisions.

The appellants argued before the district court that the amendment was improperly on the ballot because the Act applied to the initiative petitions and required that the sponsors circulate both English and Spanish copies of the petition in the special bilingual areas. The appellants contended that the Act applied to the initiative process since the state officials' involvement constituted state action under the Act, and the initiative petitions were materials relating to the electoral process within the language of the Act. The district court disagreed, finding the involvement by state officials in

1. The Florida English Campaign, U.S. English Legislative Task Force, Inc., and U.S. English Foundation, Inc. intervened as defendants. These organizations support the proposed constitutional amendment and represent the interests of the 362,555 proponents of it.

the initiative process did not constitute state action. Therefore, it refused to enjoin a vote on the amendment.

On October 26, 1988, plaintiffs filed an expedited appeal contesting the denial of the injunction. The question before this court is whether the district court erred in denying the injunction. A district court ruling on a preliminary injunction is reviewable only for abuse of discretion. *Zardui-Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985). That discretion is guided by four elements which must be established before a preliminary injunction is proper. *Id.* One element the movant must show is probable success on the merits. *Id.* To satisfy this element, the appellants must make a showing that the petitions are within the language "other materials or information relating to the electoral process" and that the role of the state officials here constituted state action. We will deal with these two issues respectively.

## II. INITIATIVE PETITIONS ARE NOT MATERIAL COVERED BY THE ACT.

### A. *History*

In examining whether or not these initiative petitions come within the Voting Rights Act, we should begin with the language of the statute and the legislative intent behind the words used. Section 1973b(f)(4) states:

> Whenever any State or political subdivision subject to the prohibition [against discrimination against citizens of language minorities] provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable language minority group as well as in the English language.[2]

It is clear that Congress intended the Act to be given "the broadest possible scope." *Allen v. State Bd. of Elections,* 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969). However, an examination of the legislative history demonstrates that in enacting the Act and its amendments, Congress was concerned exclusively with the ability of all citizens to exercise effectively their right to *vote.*

The Voting Rights Act of 1965 was enacted to remedy the systematic exclusion of blacks from the polls by the use of poll taxes, literacy tests, and similar devices:

> To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device....

42 U.S.C.A. § 1973b(a)(1) (1981 & Supp. 1988). There is no question that the sole purpose of this legislation was to ensure the integrity of the registration and voting process by eradicating barriers which had previously prevented blacks from voting.

The amendments to the Act passed in 1975 extended the Act's coverage to four other minority groups, including Hispanics. For the first time, Congress prohibited English-only elections in jurisdictions where more than five percent of the voting age citizen population was made up of any single language minority group, and the jurisdiction had a low voter registration or turnout in the 1972 presidential election. Title 3 of Section 203 required that any jurisdiction covered by the Act, which provides official registration or election materials, must make the materials available in the language of the particular minority language group as well as in English. The Committee on the Judiciary emphasized that minority language groups were being obstructed from exercising the franchise since they were unable to understand the ballot and other materials provided at the polls. 1975 *U.S.Code Cong. & Admin. News,* 774, 800–804.

Finally, in 1982, Congress amended the Act by, *inter alia,* providing for assistance *at the voting booth* for groups such as the blind and disabled, and others who may be unable to cast their vote without help.

2. The language of 42 U.S.C.A. § 1973aa–1a(c) is nearly identical.

Once again, it seems clear that the purpose of Congress was to further expand access to the ballot. Significantly, Congress has never shown any intent, either in the text of its legislation or in the legislative history, to expand coverage of the Act to materials distributed by private citizens. While undertaking such an expansion in the law might be within the power of Congress under the Fifteenth Amendment, it is an inappropriate step for us to take.

B. *Case Law*

The overly broad interpretation of the Act urged by appellants has been rejected by every court squarely to face the issue. In *Zaldivar v. City of Los Angeles,* 590 F.Supp. 852 (C.D.Cal.1984), *rev'd on other grounds,* 780 F.2d 823 (9th Cir.1986), the court held that a notice of intention to recall, published in English only by proponents of a recall election, did not violate the Act. In a well-reasoned opinion, the court explained that the petition process was far too removed from the voting booth to fall under the Act:

> [T]he language of the statute indicates that it applies to information relating to the electoral process.... Such a position requires a rather distorted view of the electoral process because nothing one would associate with an election occurs at that stage; principally, no voting occurs ... The Court cannot reasonably conclude that such conduct violates the Act when it is merely the first step in a process which might ultimately lead to the holding of an election to recall an elected official.... [L]egislative history indicates Congress was concerned about impediments to a citizen's ability to exercise his right to vote. Spanish speaking citizens cannot be considered to have been deprived of their right to vote by the publication of a notice of intent to recall in English only.

*Id.* at 855; *see also Gerena–Valentin v. Koch,* 523 F.Supp. 176, (S.D.N.Y.1981) ("The failure to provide bilingual petitions does not by itself deprive the Hispanic community of their right to vote....").

Most recently, in *Montero v. Meyer,* 861 F.2d 603 (10th Cir.1988), the Tenth Circuit faced a situation nearly identical to that before us. In that case the Tenth Circuit reversed a district court's order which had preliminarily enjoined the Secretary of State of Colorado from conducting an election on a proposed amendment to the state constitution. The defendants, members of the Official English Committee, had circulated a petition in English only, to gather enough signatures to have the proposition placed on the ballot for the general election.

In reversing the district court's preliminary injunction, the circuit court rejected two of the plaintiff's contentions concerning the reach of the Act. First, the court held that the circulation of an initiative petition is not a "prerequisite to voting" under 42 U.S.C. § 1973*l* (c)(1) (1975) since it does not "relate directly to the casting of a ballot" and thus cannot be included within the definition of "voting" under § 1973b(f)(4). *Montero,* at 607.[3] Second, the court held that the Act does not apply to the petition process in its own right.

The history of the Act, the stated intention of Congress, and the relevant case law persuade us that the Voting Rights Act could not properly be applied to the case before us.

C. *Attorney General Guidelines*

We reject appellant's contention that the interpretive guidelines issued by the Department of Justice regarding the language minority provisions of the Act require a contrary result. The guidelines state:

> (a) *Types of materials.* It is the obligation of the jurisdiction to decide what materials must be provided in a minority language. A jurisdiction required to provide minority language materials is only required to publish in the language of the applicable language minority group

3. The court also noted that "[i]mplicit in ... the common definitions of the concept of voting is the presence of a choice to be made.... Thus, applying the concept of voting to a process which provides no choice defies the commonly accepted usage of the term." *Id.* at 607.

> materials distributed to or provided for the use of the electorate generally. Such materials include, for example, ballots, informational materials, and petitions.

28 C.F.R. § 55.19(a) (1987). Appellant cites this section as authority for the proposition that petitions are included in the Act's definition of electoral material. While we agree with appellant that the interpretation of the agency charged with enforcing a particular law is entitled to considerable deference, *Young v. Community Nutrition Inst.*, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986); *Veterans Admin. Medical Center v. Federal Labor Relations Auth.*, 675 F.2d 260 (11th Cir.1982), we are not persuaded to find that initiative petitions are thus properly treated as electoral material.

First, as the court noted in *Montero*, these same guidelines expressly state that they are intended to be suggestive only: "This subpart [§§ 55.14–55.21] sets forth *the views of the Attorney General* with respect to the requirements of section 4(f)(4) ... concerning the provision of minority language materials...." 28 C.F.R. § 55.14(a) (emphasis added). Second, despite their eagerness to defer to the view of the Attorney General, the appellants fail to note that the guidelines themselves recognize that the primary responsibility for interpreting the provisions of the Act rests with the officials of the covered jurisdictions. Section 55.2(c), 28 C.F.R. states in relevant part:

> The determination of what is required for compliance with section 4(f)(4) and section 203(c) is the responsibility of the affected jurisdiction. These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction.

Section 55.14(c), 28 C.F.R. states in relevant part:

> It is the responsibility of the jurisdiction to determine what actions by it are required for compliance with the requirements of section 4(f)(4) and 203(c) and to carry out the actions.

Thus we find that the appellees' determination that the initiative petition need not be circulated in Spanish under the Act is entitled to at least the same and possibly greater deference than is the suggested interpretation of the Justice Department. Since we find the interpretation of the state officials more consistent with the language and clear intent of the statutes, the guidelines are not persuasive.

D. *First Amendment Considerations*

We note also the serious First Amendment questions which would be raised were we to adopt the interpretation of the minority language provision urged by appellants. The Florida Constitution expressly provides that "[t]he power to propose the revision or amendment of ... this constitution by initiative is reserved to the people...." Fla. Const. Art. XI, § 3. In establishing the mechanism of initiative petition, Florida vested its citizenry with the right and the responsibility to make needed changes in the Constitution. Thus any degree of governmental hindrance upon the freedom of a given group of citizens to pursue the initiative petition process with whomever, and concerning whatever they choose must be viewed with some suspicion.

In *Meyer v. Grant*, — U.S. —, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), the Supreme Court ruled that a Colorado statute prohibiting the use of paid circulators to gather signatures on an initiative petition violated the First and Fourteenth Amendments. The Court articulated its free speech concerns in language which is easily applicable to the case before us:

> Appellees seek by petition to achieve political change in Colorado; their right freely to engage in discussions concerning the need for that change is guarded by the First Amendment.... The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.... This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'

*Id.* 108 S.Ct. at 1891–92.[4] The characterization by the Supreme Court of initiative petitions as "core political speech" counsels us toward caution when asked to declare that federal law requires the State to impose a bilingual requirement on a petition originated by private citizens pursuant to Florida law.

In other cases concerning state statutes which purported to further some state interest by imposing restrictions on private political activity, the Supreme Court has repeatedly stressed the primacy of the rights of free speech and association. In *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Court struck down an Ohio statute which required any new political party seeking a position on the ballot in a presidential election to obtain petitions signed by 15% of the qualified electors who voted in the last gubernatorial election. Despite the state's claim that the provision was necessary to promote political compromise and stability, the Court held that "this [state] interest cannot justify the very severe restrictions on voting and associational rights which Ohio has imposed." *Id.* at 32, 89 S.Ct. at 11.

More recently, in *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), the Court struck down a Connecticut statute which required voters in any political party primary to be registered members of that party. The Court invoked a long line of First Amendment precedent in holding that the burden this imposed on private political association could not be sustained:

> The nature of the appellees' First Amendment interest is evident. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.... The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. As we have said, the freedom to join together in furtherance of common political beliefs *necessarily presupposes the freedom to identify the people who constitute the association.*

*Id.* at 214, 107 S.Ct. at 548 (emphasis added) (citations omitted). The Court went on to note that the right of "like-minded citizens in support of common political goals" to organize themselves is particularly important "at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id.* at 215–16, 107 S.Ct. at 549–50.

We are similarly reluctant to construe a federal statute to mandate the imposition of a substantial burden on the right of political association, particularly where the clear language of the Act does not so require. It is hard to imagine that in passing the Act, Congress could have intended that private citizens seeking to further their own political goals through the initiative petition process be subject to specific language requirements. Rather, the interests of both the First Amendment and the Voting Rights Act can be harmonized by limiting the latter to those activities involved in casting a vote and not to political speech.

## III. STATE ACTION IMPLICATIONS

The appellants also contend that the district court erred in holding that the state's involvement in the petition process neither constituted state action nor triggered application of the Voting Rights Act, 42 U.S.C.A. § 1973b(f)(4). More specifically, they challenge the district court's determination that the petitions were formulated by private citizens with only minimal, ministerial regulation by the state. The appellants argue that the regulatory scheme set out in various Florida statutes governing the initiative process amounts to state action in "formulating" the petitions as pro-

4. *See also Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (attempts to regulate solicitation of charitable contributions necessarily infringe upon protected speech); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (campaign expenditure limitation held to be an impermissible burden on right to core political expression).

vided in the Voting Rights Act. We disagree and hold that the district court properly concluded that the acts performed by state officials in the initiative process were ministerial in nature and did not involve state action.

Once again we stress that the Constitution of the State of Florida, in article XI, section 3, expressly reserves to the people the right to amend the constitution by initiative. That section provides in relevant part:

> The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment shall embrace but one subject and matter directly connected therewith....

Fla. Const. art. XI, § 3. The state cannot impede or diminish this process so long as it reserves the right of initiative to the people. *See Meyer v. Grant,* — U.S. —, 108 S.Ct. 1886, 1893, 100 L.Ed.2d 425 (1988). The section further delineates the procedure for processing the initiative which is codified in the Florida Election Code, chapters 97–106 of the Florida Statutes. Fla.Stat. § 97.011 et seq. (1982). Under these sections, the Florida Secretary of State is charged with limited ministerial duties regarding the initiative process. As discussed earlier, the Secretary must determine whether the total number and geographic distribution of petitions is proper, approve the format of the petition, and finally submit it to the Attorney General of Florida certifying that the formal petition requirements have been complied with. However, contrary to appellants' position, these duties do not constitute state formulation of the initiative petition.

In *Montero v. Meyer,* 861 F.2d 603, (10th Cir.1988) the Tenth Circuit addressed this precise issue under the Colorado constitutional initiative scheme.[5] The court held that the Voting Rights Act did not apply to an initiative petition which sought to establish English as the official language of Colorado. In discussing whether the state regulation of the initiative process constituted state action, the court said that

> [t]he acts performed by [state] officers are designed primarily to make the initiative process fair and impartial, and do not constitute providing the petitions to the electorate. At most, the acts of the state officers could be regarded as "regulatory," but state regulation is insufficient to convert private action into state action.

*Id.* at 610 (footnote and citations omitted). This reasoning applies to the present case. The Florida initiative procedures merely provide the framework for the general public to submit proposed amendments to the constitution for inclusion on the general election ballot. The Secretary of State and Attorney General act only to assist all citizens in complying with the legal requirements for such petitions primarily as to form. They neither censor nor endorse the content of any initiative petitions. As the district court noted, the Florida Constitution mandates that a petition be placed on the general election ballot once it conforms to certain format requirements and the single-subject rule. Thus, the statutory scheme serves solely to facilitate proposal of amendments through private action rather than through complex state action.

As discussed earlier, in *Zaldivar v. City of Los Angeles, supra,* the court held that the Voting Rights Act did not apply to a notice of intention to recall a city councilman initiated pursuant to a private citizen petition. In finding that the Act did not apply to the situation where private citizens were wholly responsible for initiating the action, the court stated that the Act did apply to instances relating to the electoral process. *Id.* at 855. The court reasoned and emphasized that the petition process is distinct from the electoral process since in the former, nothing associated with an elec-

5. Although we note that the Colorado statutory regulation of the initiative process differs somewhat from that of Florida, we are persuaded by the Tenth Circuit's reasoning in this case involving nearly identical issues of the application of § 1973b(f)(4) to proposed constitutional amendments by voter initiative.

tion happens; principally, no voting occurs. *Id.* According to the court, the petition procedure merely comprises the first step in a process which might ultimately result in an election. It does not implicate the voting process itself.[6] *Id.* We agree.

The distinction between the petition process and the electoral process is relevant in examining the appropriate standard for state action to be applied in this case. The appellants argue that the Voting Rights Act was enacted to implement the guarantees of the fifteenth amendment and therefore, the relaxed standard delineating state action in that context is applicable. Appellants' reliance on the fifteenth amendment cases is misplaced. Although it is true that the Act's legislative history encompasses concerns to protect "the fundamental principle that the right to vote shall not be denied or abridged ... on account of race or color," H.R.Rep. No. 439, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 2437, 2439, when a process other than one implicating the constitutional right to vote is challenged, the correct standard regarding state action involves analysis under the fourteenth amendment.

As stated by the Tenth Circuit in *Montero, supra,* "applying the concept of voting to a process which provides no choice [such as the initiative petition process] defies the commonly accepted usage of the term." *Id.* at 607. Moreover, the court held "that the 'electoral process' to which the minority language provisions of the Act apply does not commence ... until the Secretary of State certifies the measure is qualified for placement upon the ballot, and that signing of an initiated petition is not 'voting.'" *Id.* Thus, since the initiative process in the present case is not "voting," state action is present only if: 1) the governmental and private actors share a "symbiotic relationship," *Rendell-Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) such that the state is recognized as a joint participant in the challenged activity, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961); 2) the government has delegated a traditional state power to the private party, *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974); or 3) the government and the private party share a close nexus such that the private party's actions are deemed those of the state. *Id.* at 351, 95 S.Ct. at 453. Florida's regulatory scheme meets none of these standards.

No state action link exists between the proponents of the English language petition and the state statutory scheme. The state does not initiate the petition, does not draft the language of the petition, does not address the merits of the proposal and does not participate in any way in the circulation of the petition or in the collection of signatures.[7] Rather, all of this action is taken by private citizens. The state's responsibility is to ensure that the petition meets the requirements of law and will fairly present the proposition that may or may not be placed before the electorate. Such regulation is not sufficient to transpose such private conduct into state action. It is only after a petition is successfully subscribed to that it becomes a matter to be put to a vote—a part of the electoral process.

As the district court noted, the "petitions represent the exercise by individuals of their fundamental rights to express themselves freely and to petition the government for redress of grievances, which are

6. *See also, Gerena-Valentin v. Koch,* 523 F.Supp. 176, 177 (S.D.N.Y.1981) (no violation of the Voting Rights Act since failure to provide bilingual petitions does not by itself deprive the Hispanic community of their right to vote).

7. In contrast to Florida's initiative petition scheme, the State of Massachusetts itself prints and *provides* initiative petitions to its electorate. The state also pays for the cost of printing the petitions. *See* Mass. Const., Amend. Art. 48, Init. Pt. 2 § 3. Pursuant to the Voting Rights Act, Massachusetts prints its petitions in both English and the language of the applicable language minority group. However, we note an important distinction between states which pay for and print their own petitions, and those, like Florida, which leave these actions wholly to the private citizen proponents of the petition. In the latter situation, the purely private acts do not trigger state action.

protected against governmental intrusion by the First Amendment to the United States Constitution." *Delgado v. Smith*, No. 88–1880 (S.D.Fla., Oct. 24, 1988). The United States Supreme Court recognized that circulation of a petition involves activity protected as core political speech. *Meyer, surpa*, 108 S.Ct. at 1892. Consequently, the right of the people of Florida to propose this constitutional amendment by initiative implicates crucial first amendment protections. State regulation that attempts to make certain that the views of hundreds of thousands of its citizens can be fairly voted upon by the electorate does not equate with state action. The state's sole concern is a fair presentation on the *ballot* in accordance with state law.

These concerns, along with the lack of state action in the purely ministerial statutory scheme governing initiative petitions, mandate this court to uphold the district court's denial of the appellant's petition for injunctive relief. AFFIRMED [8].

ANDERSON, Circuit Judge, dissenting:

Respectfully, I dissent. I am persuaded that the initiative petitions at issue are "materials or information relating to the electoral process" within the meaning of section 4(f)(4) of the Voting Rights Act, 42 U.S.C. § 1973b(f)(4), and that the state of Florida has "provided" those materials within the meaning of the statute.

I.

Section 4(f)(4) of the Voting Rights Act provides in relevant part:

> Whenever any State or political subdivision [subject to the bilingual electoral requirements] ... provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable language minority group as well as in the English language.

42 U.S.C. § 1973b(f)(4).[1] The non-governmental appellees' argument that § 4(f)(4) applies only to voter registration and actual elections is inconsistent with the plain meaning of the statute and is contrary to Congressional intent.

The statute refers not only to registration forms and ballots, but also to "other materials or information relating to the electoral process." Appellees' position would strip the quoted statutory language of any meaning. It seems clear to me that the petitions at issue easily fall within the phrase "materials or information relating to the electoral process." Certainly the language Congress chose—"relating to the electoral process"—is broad enough to encompass an initiative process which, if successful, results in placing a proposed constitutional amendment before the electorate of Florida for approval or rejection.

The Supreme Court's holding in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), requires a conclusion that the instant petitions are "related to the electoral process." The Court held in *Allen* that the petition process to place candidate names on the ballot is a "standard, practice, or procedure with respect to voting" under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. The nomination petition in *Allen* was a stage in the electoral process comparable to the petition process in this case. Moreover, the language of section 4(f)(4), "materials ... related to the electoral process," is at least as broad as, if not broader than, the "standard, practice, or procedure with respect to voting" language in section 5 which the *Allen* Court applied to nominating petitions.

8. Because this is an accelerated appeal involving the elections scheduled for November 8, 1988, the court heard oral argument in Miami, Florida, on November 3, 1988. Both the majority and dissenting opinions have been rushed. Although we feel we have been fully advised as to the issues and are comfortable that we have examined all the authorities, we note that both opinions are not polished products.

1. Practically identical language is found in section 203(c) of the Voting Rights Act, 42 U.S.C. § 1973aa–1a.

This conclusion is also supported by the Justice Department's regulations for implementing § 4(f)(4), which provide as follows:

> (a) *Types of materials.* It is the obligation of the jurisdiction to decide what materials must be provided in a minority language. A jurisdiction required to provide minority language materials is only required to publish in the language of the applicable language minority group materials distributed to or provided for the use of the electorate generally. Such materials include, for example, ballots, sample ballots, informational materials, and *petitions.*

28 C.F.R. § 55.19(a) (1987) (emphasis added). The Justice Department's inclusion of petitions as an example of materials that must be provided in the language of the applicable language minority group is consistent with its position that "the objective of the Act's provisions is to enable members of applicable language minority groups to participate effectively in the electoral process." 28 C.F.R. § 55.2(b) (1987).[2]

Of course, courts owe considerable deference to the Attorney General's construction of the Voting Rights Act. *United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 131–32, 98 S.Ct. 965, 979–80, 55 L.Ed.2d 148 (1978). Deference is especially appropriate here, because the Attorney General's interpretation mirrors the language of the statute itself and Congress has implicitly endorsed the Attorney General's inclusion of petitions as relating to the electoral process. *Pleasant Grove v. United States,* 479 U.S. 462, 468, 107 S.Ct. 794, 798, 93 L.Ed.2d 866 (1987); *see Extension of the Voting Rights Act: Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary on the Extension of the Voting Rights Act,* 97th Cong., 1st Sess. 2323–30 (1981).

Furthermore, the Supreme Court has stated that the Voting Rights Act is to be broadly construed. *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), stated that

> We must reject a narrow construction that appellees would give to § 5.... [T]he Act gives a broad interpretation to the right to vote, recognizing that voting includes "all action necessary to make a vote effective."

393 U.S. at 565–66, 89 S.Ct. at 831, quoting 42 U.S.C. § 1973*l* (c)(1) (1964 ed., Supp. I). A broad construction of the already broad language of the language minority provision—"other materials or information related to the electoral process"—must necessarily encompass the instant petitions.

## II.

The "state action" prong of our inquiry is a somewhat closer question. The language minority provisions of the Voting Rights Act apply to electoral materials which the state "provides." 42 U.S.C. § 1973b(f)(4).

Before an initiative can be considered for the ballot in Florida, its sponsors must follow a detailed procedure prescribed by state law. The Florida Election Code, Fla. Stat.Ann. chs. 97–106, requires that the group sponsoring the proposed constitutional amendment must register with the Florida Department of State, Division of Elections, as a political committee before it begins collecting any signatures. Fla.Stat. Ann. §§ 100.371(3), 106.03. The sponsor must submit the text of the proposed amendment, and the form of the petition to

2. The non-governmental appellees argue that the Justice Department guidelines for implementing the Act delegate authority to the affected jurisdictions to determine precisely what steps are necessary to comply with the Act. 28 C.F.R. § 55.2(c) (1987) does state that "[t]he determination of what is required for compliance with section 4(f)(4) and section 203 is the responsibility of the affected jurisdiction. These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction." *See also* 28 C.F.R. § 55.14(c) (1987) (similar language). The import of this language is that the Justice Department encourages jurisdictions to fashion bilingual election procedures with the needs of their locale in mind. It does not provide a license to evade the mandate of the language minority provisions of the Voting Rights Act. Nor does it undermine the regulation's definition of the Act's minimum requirements—i.e., "to publish in the language of the ... minority group materials distributed to ... the electorate generally ... for example ... petitions."

be circulated, to the Florida Secretary of State for approval. State approval of this form is required before the sponsor may obtain any signatures. Fla.Stat.Ann. § 100.371(3). The Florida Secretary of State has promulgated detailed regulations specifying the form that constitutional amendment initiative petitions must take. Among other things, the petition form must be printed on separate cards or sheets of paper and must fall within certain size requirements; the form must contain space for the signee's name and address; there must be space for only one signature per petition form; the petition form must conspicuously contain the full text of the proposed amendment preceded by the title and substance; and, if the text continues on the other side of the form, the same must be clearly indicated. Dept. of State Reg. 1C-7.009. In addition, a proposed constitutional amendment may relate to only one topic.[3]

The purpose and effect of these very specific and detailed state regulations of the form of initiative petitions are obviously to ensure that the presentation of the proposed amendment to each elector be in a manner that is easily understood. In my judgment, it is significant that the language minority provisions of the Voting Rights Act have the same purpose—to aid in the clear presentation of electoral materials to those members of the electorate who are not fluent in English. In other words, the state has affirmatively acted in several ways to safeguard elector understanding, but has failed to act in one way specifically required by the Voting Rights Act.

There is additional and significant state involvement in that state law prohibits *any* private action circulating initiative petitions until state officials approve the form of the petitions. Fla.Stat.Ann. § 100.361(3).[4] Thus, the instant petitions, in English only, were submitted to the Florida Department of Elections pursuant to state law, and the state officials *approved* the petitions in their English-only form. I conclude that this state approval, together with the extensive state regulation of the form of the petitions—regulation of a nature directly analogous to the language minority provisions—is sufficient state involvement to trigger application of the Voting Rights Act. Therefore, I conclude that the state has "provided" the electoral materials within the meaning of the Act.[5]

3. Before the voters of Florida are allowed to pass on the initiative, the Secretary of State must submit the text of the proposed amendment to the Attorney General of Florida, who in turn must seek an advisory opinion from the Supreme Court of Florida on the question whether the proposal complies with the state's "single-subject" requirement for all enactments. Fla.Stat.Ann. §§ 15.21, 16.061.

4. After state approval of the petition form and after the signatures have been obtained, the Election Code and accompanying regulations then require the sponsors to submit the signed petitions to the Supervisor of Elections for each jurisdiction, who must verify the number of valid signatures that have been obtained. Fla. Stat.Ann. § 100.371(4); Dept. of State Reg. 1C-7.0091 (1988). The Supervisors transmit forms that certify the number of valid signatures to the Division of Elections, which compiles the forms and determines whether the constitutional formula has been met. If the requirements have been fulfilled, the Secretary of State issues a certificate of ballot position for the proposed amendment. Fla.Stat.Ann. § 100.371(4).

Appellees' argument that the state action is merely ministerial, *see also Montero v. Meyer,* 861 F.2d 603 (10th Cir. 1988), would have more force if one considered only the state action described in this footnote, i.e., counting and validating the signatures. However, the state action described and discussed in the text is of a different order. The state regulation of the format is obviously designed to insure understanding of the proposed amendment, and, significantly, the actual format to be used must be *approved* by the state.

5. I agree with appellees that their determination of the substance of the proposed amendment and their circulation of the petitions themselves is wholly private political activity. Such private activity is to be distinguished from the state activity in regulating and approving the form to ensure easy understanding.

The non-governmental appellees raise the specter of a violation of their First Amendment right to petition the government for redress of grievances, citing *Meyer v. Grant,* — U.S. —, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). *Meyer* held invalid a Colorado provision making it a felony to pay petition circulators. Unlike the state provision which *Meyer* held unconstitutional, the instant federal regulation imposes no burden at all on the petition process. The minority language translation required by the Voting Rights Act imposes no conceivable hindrance to circulating the petitions or collecting

As noted above, the Justice Department regulations include "petitions" in the definition of "materials relating to the electoral process." 28 C.F.R. § 55.19(a) (1987). Because petitions are almost always generated by private political activity, such as the initiative at issue here, the regulation indicates that there is usually sufficient state involvement to trigger application of the Act.

Finally, my conclusion that the state action prong is satisfied by Florida's involvement in the initiative process is supported by the requirement under Supreme Court precedent that the language of the statute be given a broad interpretation. *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).[6]

III.

Very few courts have confronted the question before us today. Appellees point to *Gerena-Valentin v. Koch*, 523 F.Supp. 176 (S.D.N.Y.1981), as standing for the proposition that the language minority provisions of the Act do not apply to petitions. In *Gerena-Valentin*, a candidate for the New York City Council alleged that the city violated section 4(e) of the Act (which prohibits states and localities from conditioning the right to vote on the ability to read and understand English) by failing to provide bilingual aid in the ballot petition process. In rejecting the candidate's claim, the court stated that "there was no showing that the defendants failed to adequate-

signatures, and could not conceivably reduce the number of signatures which the sponsors could likely obtain. *Meyer*, — U.S. at —, 108 S.Ct. at 1892. The Voting Rights Act, as well as other federal regulation of the electoral process, has repeatedly withstood constitutional challenges to its validity. *See, e.g., South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966); *Buckley v. Valeo*, 424 U.S. 1, 143–44, 96 S.Ct. 612, 693–94, 46 L.Ed.2d 659 (1976).

Clearly, the substance of the speech to be communicated is not affected by the Spanish translation of the proposal. As the Court noted in *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983), "States have enacted comprehensive and sometimes complex election codes.... [T]he State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." The bilingual requirement is a reasonable regulation to promote elector understanding, precisely like the other regulations adopted by Florida governing the form of initiative petitions.

6. Because the state here has explicitly approved the petition form in English only, I would conclude that the state action analysis of the Fourteenth Amendment has been satisfied. This case does involve extensive state regulation of the form in which petitions are to be presented to the electorate, regulation of the same character as the bilingual language provision. That by itself may be sufficient to satisfy the Fourteenth Amendment state action analysis, *see, e.g., Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed. 2d 477 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, I need not reach that issue for two reasons. First, and most important, a finding of state action in this case does not depend upon treating private action (by virtue of extensive state regulation) as the equivalent of state action. Rather, in this case, the state itself has acted; the state has affirmatively approved the English-only petition form.

Second, I suggest that the district court erred in relying only on Fourteenth Amendment cases. As stated in the text, the issue whether the state "provides" the petitions at issue here is a matter of statutory construction, and the Voting Rights Act is to be read broadly in order to effectuate its goals of an informed electorate and a fair political process. And in any event, I suggest that cases construing the Fifteenth Amendment provide the more appropriate precedent. Congress enacted the Voting Rights Act pursuant to the enforcement provision of the Fifteenth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 327–28, 86 S.Ct. 803, 818–19, 15 L.Ed.2d 769 (1966). The Supreme Court has indicated that a broad range of electoral activity, even purely private action, may constitute state action for Fifteenth Amendment purposes. *See, e.g., Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (actions of "self-governing voluntary club" held state action under the Fifteenth Amendment); *id.* at 473, 73 S.Ct. at 815 (opinion of Frankfurter, J.) ("The vital requirement is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme by which colored citizens are denied voting rights merely because they are colored."); *Smith v. Allwright*, 321 U.S. 649, 660, 64 S.Ct. 757, 763, 88 L.Ed. 987 (1944) (primaries and other events essential to the electoral process subject to Fifteenth Amendment: "the recognition of the place of the primary in the electoral scheme makes clear that state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function that may make the party's action the action of the State.").

ly provide bilingual assistance in the ballot petition process." 523 F.Supp. at 177. Although the court did say that "the failure to provide bilingual petitions does not by itself deprive the Hispanic community of their right to vote, particularly where as here the plaintiffs have not made any effort on their own to provide the bilingual aid they now request," 523 F.Supp. at 177, I note that the court was considering § 4(e) of the Act, and not § 4(f), which contains the language minority provisions. Moreover, *Gerena–Valentin* does not provide any factual detail; for example, it does not appear that New York played any part in establishing the form or contents of the petitions in that case. In sharp contrast, Florida plays an extensive role in regulating the form of the initiative petitions at issue here. In any event, the sparse analysis provided by the *Gerena–Valentin* court leaves the opinion with little precedential weight.

The district court in *Zaldivar v. City of Los Angeles,* 590 F.Supp. 852 (C.D.Cal. 1984), held that the recall petition process was not part of the electoral process. However, the precedential value of that case was undermined on appeal. In reversing the district court's award of Rule 11 sanctions, the Ninth circuit, in dicta, indicated that the petition process probably was part of the electoral process under the Act. *Zaldivar v. City of Los Angeles,* 780 F.2d 823 (9th Cir.1986).

Most recently, the Tenth Circuit concluded that the Voting Rights Act did not cover Colorado initiative petitions very similar to those at issue today. In *Montero v. Meyer,* 861 F.2d 603 (10th Cir.1988), the Tenth Circuit concluded that Colorado initiative petitions were not materials relating to the electoral process, because "the 'electoral process' to which the minority language provisions of the Act apply does not commence under Colorado law until the Secretary of State certifies the measure is qualified for placement upon the ballot." *Montero,* 861 F.2d at 607. In light of the plain meaning of the Act itself, the Attorney General's interpretation of the statute, and the Supreme Court's decision in *Allen*—all

discussed in part I above—I find the analysis of the Tenth Circuit unpersuasive.

The Tenth Circuit also concluded that the petitions were not "provided" by the state, and thus that the "state action" prong of the Act was not satisfied. The court assumed that the state action was merely "ministerial" and stated only that "[a]t most, the acts of the state officers could be regarded as 'regulatory,' but state regulation is insufficient to convert private action into state action." *Montero,* 861 F.2d at 610. Because the Tenth Circuit's analysis of the "state action" prong was merely conclusory, I respectfully suggest that it should be accorded little precedential weight.

### IV.

Because I believe that the initiative petitions at issue constitute "materials relating to the electoral process" that are "provided" by the state of Florida within the meaning of the language minority provisions of the Voting Rights Act, I must respectfully dissent.