# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANDRA PADILLA; VICTOR SANCHEZ;
ROSA ANDRADE,
            *Plaintiffs-Appellants,*

                  v.

ROSALYN LEVER, in her official
capacity as Registrar of Voters,
Orange County Registration and
Elections Department; SUZANNE
SLUPSKY, in her official capacity as
Assistant Registrar of Voters,
Orange County Registration and
Elections Department,
            *Defendants-Appellees,*

                  and

VIVIAN MARTINEZ,
            *Defendant.*

No. 03-56259

D.C. No.
CV-02-01145-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued and Submitted
February 8, 2005—Pasadena, California

Filed November 23, 2005

Before: Harry Pregerson and William C. Canby, Jr.,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

15485

Opinion by Judge Pregerson;
Dissent by Judge Canby

## COUNSEL

Thomas A. Saenz, Mexican American Legal Defense and Education Fund, Los Angeles, California, for the plaintiffs-appellants.

Wendy J. Phillips, Deputy County Counsel, Santa Ana, California, for the defendants-appellees.

George W. Shaeffer, Jr., Breon, Shaeffer & Bryant, Irvine, California, for the amici curiae.

## OPINION

PREGERSON, Circuit Judge:

Plaintiffs, residents and registered voters in the Santa Ana Unified School District ("SAUSD") whose primary language is Spanish, appeal the district court's dismissal of their lawsuit, filed pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1973aa-1a(c). Plaintiffs' suit sought declaratory and injunctive relief against the Orange County elections officials charged with overseeing the recall election process in the SAUSD because the officials failed to ensure that petitions in the recall of School Board Member Nativo Lopez were provided in Spanish as well as English. For the reasons set forth below, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

In March 2002, defendant Vivian Martinez,[1] along with ten

---

[1]Martinez was not initially named as a defendant in this suit. Rather, after Martinez filed an Ex Parte Application for Order Staying Proceedings and Shortening Time for hearing on Motion to Intervene, the plaintiffs filed a First Amended Complaint inserting Martinez's name as a defendant instead of two previously named defendants.

other individuals, initiated a recall process against Santa Ana Unified School District ("SAUSD") Board Member Nativo Lopez. Martinez and the other recall proponents ("Recall Proponents") are private citizens, and all are registered voters of the SAUSD.

Pursuant to California Elections Code section 11000 *et seq*., the Recall Proponents drafted and printed a Notice of Intention to Circulate Recall Petition ("Notice of Intention"). The Notice of Intention included a statement of the grounds for the recall, and was printed only in English. The Recall Proponents filed the Notice of Intention with the Orange County Registration and Elections Department (the "Orange County Elections Department") and a copy was served on Lopez on March 25, 2002. In response to the Notice of Intention, Lopez filed an Answer with the Orange County Elections Department, which he also served on the Recall Proponents. Lopez's Answer was printed only in English.

After receiving Lopez's Answer, the Recall Proponents drafted a Petition for Recall ("Recall Petition") pursuant to the California Secretary of State's regulations and to conform to the requirements of the California Elections Code. The Recall Petition included a request to hold an election to replace Lopez, the Notice of Intention (including a statement of the reasons for the recall), and Lopez's Answer. Except for Lopez's Answer (which was drafted by Lopez), the Recall Proponents drafted the contents of the Recall Petition, in adherence to the statutory content requirements and using the format provided by the Secretary of State. This draft Recall Petition was in English only.

As required by Elections Code section 11042, the Recall Proponents filed two blank copies of the Recall Petition with the Orange County Elections Department, along with a proof of publication of the Notice of Intention, for elections officials to ascertain whether the Recall Petition conformed to the proper format and applicable election law. *See* Cal. Elec.

Code § 11042(a). The Orange County Elections Department reviewed the proposed form and wording of the petition to recall Lopez and concluded that the petition conformed to the requirements of the California Elections Code. Thus, elections officials authorized the proposed Recall Petition for circulation. The Recall Petition was printed only in English and elections officials did not require translation into Spanish. The final Recall Petition was printed at the Recall Proponents' expense and was printed only in English.

In April 2002, the Recall Proponents circulated the Recall Petition and began obtaining signatures. On September 12, 2002, the Recall Proponents submitted signed petitions to the Orange County Elections Department. Orange County elections officials Rosalyn Lever and Suzanne Slupsky verified the petition signatures and determined that sufficient signatures had been obtained to hold a recall election. Two weeks later, Lever issued a Certificate of Sufficiency of Signatures on Recall Petition, thereby confirming that the signed petitions contained sufficient signatures to support a recall election.

After certifying the petition signatures, SAUSD called for the recall election to be held on February 4, 2003. The election would determine whether Lopez should be recalled and, if so, who would be his successor. In addition to defendant Martinez, four other candidates appeared on the recall ballot.

On December 12, 2002, Sandra Padilla and other residents and registered voters in the SAUSD whose primary language is Spanish, filed suit seeking injunctive and declaratory relief against Orange County elections officials Lever and Slupsky,[2] who were charged with overseeing the recall. Plaintiffs' suit alleged that the Recall Petition violated section 203, 42 U.S.C. § 1973aa-1a, of the 1965 Voting Rights Act, which

---

[2]Lever and Slupsky were sued in their official capacities as, respectively, Registrar and Assistant Registrar for the County of Orange.

requires that voting materials in certain voting districts be distributed in specified minority languages as defined by the Voting Rights Act and by U.S. Attorney General Regulations. Plaintiffs sought an injunction prohibiting the Orange County Elections Department from taking any steps to proceed with the recall election and requiring translation of the Recall Petition into Spanish as required by section 203. Eight days later, plaintiffs moved for a temporary restraining order, seeking to restrain defendants Lever and Slupsky from conducting the February 4, 2003 recall election.

In their suit, plaintiffs allege that because defendants failed to require translation of the Recall Petition, plaintiffs signed the circulated petitions without being aware that they were signing a petition to recall Lopez. According to plaintiffs, the petitions they signed were printed only in English and petition circulators misrepresented the purpose of the petition. Specifically, plaintiffs charge that petition signature collectors told them that the petition was merely a form to request additional information and was not, in fact, a petition to recall Lopez.

The district court denied plaintiffs' request for a temporary restraining order on December 24, 2004, concluding that plaintiffs failed to show that they were likely to succeed on the merits and failed to raise the existence of serious questions going to the merits. On January 10, 2003, the district court denied plaintiffs request for a preliminary injunction.[3] On

---

[3]The disputed recall election has already occurred, thereby mooting plaintiffs' request for injunctive relief. However, their request for declaratory relief remains ripe for consideration because it challenges a wrong that is capable of repetition yet evading review. *See In re Burrell,* 415 F.3d 994, 998 (9th Cir. 2005) (noting four major exceptions to mootness doctrine, including "wrongs capable of repetition yet evading review"). The "capable of repetition yet evading review" exception applies where "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002) (quoting *Greenpeace Action v. Franklin*,

February 21, 2003, the district court granted defendant Martinez's Rule 12(b)(6) motion and dismissed plaintiffs' suit against Martinez, with prejudice. Finally, on June 16, 2003, the district court granted remaining defendants Lever and Slupsky's motion for Judgment on the Pleadings under Rule 12(c), dismissing plaintiffs' suit with prejudice. Relying on *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988), and *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988), the district court concluded that the Recall Petition was not governed by

---

14 F.3d 1324, 1329 (9th Cir. 1993)). "The duration component of the repetition/evasion analysis is present where the underlying action is almost certain to run its course before either this court or the Supreme Court can give the case full consideration." *Id.* (internal quotations and citations omitted). An issue "evades review" when, "in its regular course, [it] resolves itself without allowing sufficient time for appellate review." *Id.*; *see also Greenpeace Action*, 14 F.3d at 1329-30 (finding that one year was not sufficient time for judicial review); *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 855 (9th Cir. 1999) (finding that two years not enough time to allow for full litigation). Here, the district court denied the petition for injunctive relief and the election was held within two weeks of the filing of plaintiffs' appeal, leaving an insufficient time to resolve the dispute before the election.

"The second component of the repetition/evasion exception to the mootness doctrine requires a probability that the challenged action will affect the Appellants in the future." *Biodiversity Legal Found.*, 309 F.3d at 1174. Where a plaintiff seeks declaratory relief, the question before us is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 1174-75 (quoting *Md. Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The plaintiffs seek declaratory relief on behalf of minority-language speaking voters on the ground that elections officials permitted the printing and distribution of English-only recall petitions in violation of the Voting Rights Act. Defendants argue that section 203 does not require the translation of recall petitions. It is clear that a substantial controversy exists between the parties and will continue absent a decision in this case. Moreover, this recall election was not an isolated incident, but an event that in all probability will recur. Thus, we conclude that we have jurisdiction to consider the plaintiffs' request for declaratory relief.

section 203 of the Voting Rights Act because it was not "provided by" the Orange County elections officials and because it was not material or information "relating to the electoral process," *see* 42 U.S.C. § 1973aa-1a. Plaintiffs appeal.[4]

## DISCUSSION

### I.   Standard of Review

We review de novo a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). Likewise, dismissals on the pleadings under Rule 12(c) are reviewed de novo. *See Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004).

### II.   Section 203 of the Voting Rights Act

#### A.   *The Voting Rights Act of 1964*

In 1975, Congress amended the Voting Rights Act to require certain jurisdictions to provide bilingual voting materials. *See* 42 U.S.C. § 1973aa-1a; *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 826 (9th Cir. 1986), *overruled on other grounds by Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990). Congress took this action after expressly finding that,

> [T]hrough the use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process. Among other factors, the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational

---

[4]Plaintiffs also filed an Emergency Motion for Injunction Pending Appeal, which this court denied on January 30, 2003. That appeal was dismissed on February 25, 2003, pursuant to plaintiffs' request.

opportunities afforded them resulting in high illiteracy and low voting participation. The Congress declares that, in order to enforce the guarantees of the [F]ourteenth and [F]ifteenth [A]mendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting these practices, and by prescribing other remedial devices.

42 U.S.C. § 1973aa-1a(a). To remedy this voting discrimination, Congress acted to require that,

Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language.

42 U.S.C. § 1973aa-1a(c). Section 203's remedial provisions apply if (1) five percent or more of the voters in the state or political subdivision are members of a single language minority, and (2) the illiteracy rate among this group is higher than the national average.[5] 42 U.S.C. § 1973aa-1a(b)(2)(A); *Zaldivar*, 780 F.2d at 832.

---

[5]Specifically, the Voting Rights Act states that:

A State or political subdivision is a covered State or political subdivision for the purposes of this subsection if the Director of the Census determines, based on census data, that —

(i)(I) more than 5 percent of the citizens of voting age of such State or political subdivision are members of a single language minority and are limited-English proficient;

(II) more than 10,000 of the citizens of voting age of such political subdivision are members of a single language minority and are limited-English proficient; or

The parties do not dispute that SAUSD is subject to the bilingual provisions of the Voting Rights Act. *See* 28 C.F.R. pt. 55 app. Rather, the central dispute is whether recall petitions fall under the Act's translation requirements.

## B.    Is There Any Controlling Precedent?

Plaintiffs contend that *Zaldivar v. City of Los Angeles* controls our decision here. In *Zaldivar*, the issue was whether the district court properly imposed Rule 11 sanctions against the plaintiffs' counsel on the ground that "their Voting Rights claims were 'totally frivolous' and 'totally without merit.' " *Zaldivar*, 780 F.2d at 827. Plaintiffs argued that section 203 applied to recall petitions and claimed that the defendant violated the Voting Rights Act by not translating the petitions into the appropriate minority language. *Id.* at 825-26. The panel noted that it was not reviewing Plaintiffs' complaint in the same way as it would under Rule 12(b)(6), and that "[u]nder the appropriate legal standard, we are concerned only with whether the complaint asserts a good faith argument for applying the Voting Rights Act under these circumstances, even if that legal argument may ultimately fail." *Id.* at 832.

[1] Nevertheless, the panel determined that the "basic question we must answer is whether the plaintiffs have an arguable claim under the Voting Rights Act." *Id.* It then determined that they did. *Id.* at 833. In so concluding, the panel rejected the argument that a recall notice is merely a "preliminary step

---

(III)  in the case of a political subdivision that contains all or any part of an Indian reservation, more than 5 percent of the American Indian or Alaska Native citizens of voting age within the Indian reservation are members of a single language minority and are limited-English proficient; and

(ii)  the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate.

42 U.S.C. § 1973aa-1a(b)(2)(A).

to voting" and not covered by section 203's translation requirements. *Id.* at 833 n.11. As the panel explained,

> The argument that a recall notice is only a prelimi-nary step to voting and therefore is unaffected by the bilingual provisions of the Act is without merit. The Act requires all "notices, forms, instructions, assis-tance, or other materials or information relating to the electoral process" to be in the minority language. The Act does not exempt information or material, compelled by statute, which is preliminary to voting, but essential if an election is to occur. The argument that a necessary step, such as the publications of a notice to recall an office holder, is within the scope of section 1973aa-1a is one which can be made in objective good faith.

*Id.*

[2] Defendants dismiss this quoted language as "dicta" and urge this court to disregard *Zaldivar*. What exactly constitutes "dicta," however, is hotly contested and judges often disagree about what is or is not dicta in a particular case. *See United States v. Johnson*, 256 F.3d 895, 914-16 (9th Cir. 2001) (en banc) (Kozinski, J., concurring). In *Johnson*, Judge Kozinski explained that, "where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after rea-soned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *Id.* at 914*; accord Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (quoting *Johnson*); *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (per curiam) (same). Only "[w]here it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consid-eration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case."

*Johnson*, 256 F.3d at 915. Nevertheless, "any such reconsideration should be done cautiously and rarely — only where the later panel is convinced that the earlier panel did not make a deliberate decision to adopt the rule of law it announced." *Id.* If, however, "it is clear that a majority of the panel has focused on the legal issue presented by the case before it and made a deliberate decision to resolve the issue, that ruling becomes the law of the circuit and can only be overturned by an en banc court or by the Supreme Court." *Id.* at 916; *see also Cetacean Cmty.*, 386 F.3d at 1173; *Miranda B.*, 328 F.3d at 1186. This understanding of binding circuit authority was further articulated in *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (en banc) (per curiam), where we said that when a panel has "addressed [an] issue and decided it in an opinion joined in relevant part by a majority of the panel," the panel's decision becomes "law of the circuit." *Id.* at 750-51 (footnote omitted).

**[3]** In *Zaldivar*, the panel engaged in reasoned deliberation and made a considered decision regarding whether the Voting Rights Act applies to recall petitions. *See Zaldivar*, 780 F.2d at 832-33. In two pages of opinion, the panel described Congress's intent in amending the Voting Rights Act to include a minority language translation requirement, considered the purpose of the Voting Rights Act, and whether the purpose was served in applying it to recall petitions. *See id.* Nothing in the panel's consideration of this issue suggests that its decision was made casually or without due consideration.

**[4]** While the panel's discussion of section 203 was preliminary to its decision on the appropriateness of Rule 11 sanctions, the panel made a deliberate decision to resolve the issue. Even if we were not bound by its conclusion, we find *Zaldivar*'s reasoning compelling and useful in resolving the current dispute.[6]

---

[6]The dissent takes issue with our discussion of *Zaldivar*. However, as the next section makes clear, independent of *Zaldivar*, we reach the same result.

Defendants, however, argue that two out-of-circuit decisions should determine the outcome here. In the first case, *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988), the Tenth Circuit held that initiative petitions did not fall under the Voting Rights Act's bilingual requirements. *See id.* at 609-10. In *Montero*, the plaintiffs challenged initiative petitions circulated by members of the Official English Committee seeking to amend the Colorado Constitution to make English the state's official language. *Id.* at 605. According to the Tenth Circuit, the "electoral process" did not commence until a measure qualified for placement on the ballot and signing an initiative petition was not "voting" within the meaning of the Voting Rights Act. *Id.* at 607. The court further held that petitions were not "provided by" the state such as to make the minority language provisions operable. *Id.* at 609-10. Rather, the court reasoned that the state's actions in approving the initiative petitions were merely "ministerial" and did not alter the character of the petitions or render their circulation "state action." *Id.* at 610.

Employing similar reasoning, the Eleventh Circuit reached the same conclusion in *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988). Like *Montero*, this case also involved a proposed citizen initiative to make English the official language of Florida. *Id.* at 1491. The court concluded that the Voting Rights Act did not apply because Congress did not intend the bilingual requirements to apply to private citizens. *Id.* at 1492. In addition, Florida elections officials' involvement in approving the initiatives was "ministerial" and did not constitute "state action." *Id.* at 1495-96. Thus, the initiative to amend Florida's Constitution to make English the state's official language did not require translation into minority languages under the Voting Rights Act. *Id.* at 1498.

We are not persuaded to depart from *Zaldivar*'s holding by these two out-of-circuit cases, which are readily distinguishable from the instant case. First, as discussed below, we find that California's statutory scheme is more stringent than those

underlying the *Montero* or *Delgado* decisions, making the Orange County Elections Department's approval of the Recall Petition more than "merely ministerial." Neither Florida's nor Colorado's statutory and regulatory scheme governing initiative petitions are structurally equivalent to California's scheme. For instance, under Florida law, Florida elections officials are limited to verifying only that a proposed initiative petition complies with applicable format requirements; the regulations do not provide for a review of the petition's contents. *See* Fla. Admin. Code Ann. r. 1S-2.009(1) ("The Division shall review the form for sufficiency of the format only."). In contrast, California elections officials are charged with authorizing and approving the form and content of the recall petition. *See* Cal. Elec. Code § 11042(a) (charging elections officials with "ascertain[ing] if the proposed form and *wording* of the petition meets the requirements of this chapter" (emphasis added)).

While Colorado empowers elections officials to suggest revisions as to a petition's content, such revisions are merely suggestions: recommendations made as to format or content are discretionary to the petitioner. *See* Colo. Rev. Stat. § 1-40-105(2) ("[T]he proponents *may amend* the petition in response *to some or all* of the comments of the directors of the legislative council and the office of legislative legal services, or their designees." (emphasis added)). Unlike Colorado, California recall proponents are statutorily required to alter their recall petition as directed by elections officials until elections officials are satisfied that no further alterations are required. *Compare* Cal. Elec. Code § 11042(a), (c), *with* Colo. Rev. Stat. § 1-40-105(2).

Finally, that both *Montero* and *Delgado* concerned petitions to qualify English-only initiatives to amend their respective state constitutions perhaps best, and rather ironically, demonstrates the problem with excluding pre-election petitions from section 203's requirements for translation. The decisions of these circuit courts essentially exclude non-English speaking

persons from knowledgeably deciding whether to qualify an initiative enshrining an English-only requirement into their state constitutions. Such a result cannot be what Congress intended when it defined the purpose of section 203 as one to remedy past language discrimination in voting practices so as to enforce the guarantees of the Fourteenth and Fifteenth Amendments to the Constitution and to ensure that citizens of language minorities are no longer effectively excluded from participation in the electoral process. *See* 42 U.S.C. § 1973aa-1a(a).

## C.   *The Voting Rights Act and Recall Petitions*

**[5]** Section 203 of the Voting Rights Act requires translation into the jurisdiction's minority language(s) whenever a state or political subdivision "provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots." 42 U.S.C. § 1973aa-1a(c). Thus, the essential questions here are (1) whether recall petitions are "other materials or information relating to the electoral process," and (2) whether the Orange County Elections Department "provided" the recall petitions.

As a remedial statute, the Voting Rights Act is to be broadly construed so as to achieve the Act's objectives. *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes."). The Supreme Court has explained "[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections,* 393 U.S. 544, 565 (1969) (footnote omitted). Thus, in *Allen*, the Supreme Court "reject[ed] a narrow construction . . . to § 5" and concluded that "the [Voting Rights] Act gives a broad interpretation to the right to vote, recognizing that

voting includes 'all action necessary to make a vote effective.' "[7] *Id.* at 565-66. It is this well-established canon of statutory construction that must guide our analysis here.

### 1. *"Other Materials"*

**[6]** Section 203 defines "voting materials" to "mean[ ] registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots." 42 U.S.C. § 1973aa-1a(b)(3)(A). However, it does not define what constitutes "other materials or information relating to the electoral process." *See id.* Where a statute fails to define a key term, this court's "duty, in matters of statutory construction, is to give effect to the intent of Congress." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (quoting *A-Z Int'l v. Phillips*, 323 F.3d 1141, 1146 (9th Cir. 2003)). "To this end, '[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms." *Id.* (quoting *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231-32 (9th Cir. 2003)). "When a statute does not define a term, a court should construe that term in accordance with its 'ordinary, contemporary, common meaning.' " *Id.* (quoting *A-Z Int'l*, 323 F.3d at 1146 (citation omitted)). "Only if an ambiguity exists in the statute, or when an absurd construction results, does this court refer to the statute's legislative history." *Id.*

---

[7]In a footnote, the Court further explained that,

> "Congress knew that some of the States covered by § 4(b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself."

*Id.* at 565 n.30 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 335 (1966)).

**[7]** "To determine the 'plain meaning' of a term undefined by a statute, resort to a dictionary is permissible." *Id.* Black's Law Dictionary defines "related" to mean "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." Black's Law Dictionary 1289 (6th ed. 1991). Supreme Court and Ninth Circuit precedent suggest that this broad definition of "related" is an appropriate one to use here. *See, e.g., Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992) (noting that ordinary meaning of "relating to" is "a broad one"); *Aloha Islandair Inc. v. Tseu*, 128 F.3d 1301, 1302 (9th Cir. 1997) ("The phrase 'relating to' should be construed broadly to mean 'has a connection with or reference to.' "). Based on this reading, recall petitions clearly have some "bearing or concern" and are "connected with" an election. Indeed, recall petitions serve no other purpose than to trigger an election. As the *Zaldivar* panel explained,

> The election itself is merely the culmination of th[e electoral] process. It includes those acts that a citizen must perform to establish his eligibility as a voter, as well as those acts that a candidate must perform to place his name on the ballot. The range of conduct "relating to the elector[ ]al process" includes, for example, compliance by a would-be voter with statutes regulating registration and compliance with other statutes to place a name or an issue on the ballot. That the state or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be voter, the candidate for office, or the proponents of an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature.

*Zaldivar*, 780 F.2d at 833. As noted above, *Zaldivar* rejected "[t]he argument that a recall notice is only a preliminary step

to voting and therefore is unaffected by the bilingual provisions of the [Voting Rights] Act." *Id.* at 833 n.11.

**[8]** Finally, in the Department of Justice's regulations implementing section 203, the U.S. Attorney General has defined "written materials" to "include, for example, ballots, sample ballots, informational materials, and *petitions*." 28 C.F.R. § 55.19(a) (emphasis added). While the Attorney General's views are not binding on this court, they are persuasive and bolster the conclusion that recall petitions are "other materials relating to the electoral process."[8] Furthermore, it is important to note that we owe considerable deference to the Attorney General's construction of the Voting Rights Act, particularly where the language of that interpretation mirrors the Act's own language.[9] *See United States v. Sheffield Bd. of*

---

[8]Citing *MCI Telecommunications Corp. v. AT&T, Co.*, 512 U.S. 218, 229 (1994) and *Lonberg v. Sanborn Theaters, Inc.*, 271 F.3d 953, 954 (9th Cir. 2001), defendants argue that we should not defer to the Attorney General's "contrary interpretation" where "the statute's text is clear and unambiguous." Even assuming that the statute's text is clear and unambiguous, we conclude that its clarity and lack of ambiguity weighs against the defendants' position. Moreover, the Attorney General's interpretation is far from "contradictory" to the language of section 203. Indeed, the interpretation is in keeping with the statute's purpose, as stated by Congress, of ensuring minority-language-speaking citizens full participation in the electoral process. 42 U.S.C. § 1973aa-1a(a).

[9]In *Sheffield*, the Court explained,

What is perhaps a more compelling argument concerning the original, and subsequent, congressional understanding of the scope of § 5 is that the Attorney General has, since the Act was adopted in 1965, interpreted § 5 as requiring all political units in designated jurisdictions to preclear proposed voting changes. This contemporaneous administrative construction of the Act is persuasive evidence of the original understanding, especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress. In recognition of the Attorney General's key role in the formulation of the Act, this Court in the past has given great deference to his interpretations of it.

*Sheffield Bd. of Comm'rs*, 435 U.S. at 131 (footnotes and citations omitted).

*Comm'rs*, 435 U.S. 110, 131-32 (1978); *City of Pleasant Grove v. United States*, 479 U.S. 462, 468 (1987) (noting that Attorney General's interpretation of the Voting Rights Act is entitled to considerable deference and that "Congress was aware of the Attorney General's view in this regard, and implicitly approved it, when it reenacted the Voting Rights Act in 1982"). The Attorney General's inclusion of the word "petition" in the definition of "written materials" is consistent with the Justice Department's position that the Act's purpose is to "enable members of applicable language minority groups to participate effectively in the electoral process."[10] 28 C.F.R. § 55.2(b).

According to the district court, however, "[t]he private recall petition process does not involve 'voting' because inherent in the concept of 'voting' is the exercise of a choice between two or more alternatives that has an effect on the outcome of an election. No voting or election occurs with the circulation of a recall petition." There are several problems with the district court's analysis.

**[9]** First, the district court's decision is inconsistent with the plain language of section 203 and Congress's intent. Section 203 does not say that it is limited to an actual election. *See* 42 U.S.C. § 1973aa-1a(c). If Congress had intended to limit the Voting Rights Act's scope, it could have simply used

---

[10]Defendants argue that these regulations are not a "requirement" because the same regulations also provide that "[t]he determination of what is required for compliance with section . . . 203[(c)] is the responsibility of the affected jurisdiction. These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction." *See* 28 C.F.R. § 55.2(c). But, the defendants place too much importance on this language. First, nothing in the record suggests that defendants engaged in any analysis regarding the applicability of section 203 to the Recall Petition. Second, the language cited by defendants does not diminish that regulation's minimum requirement that affected jurisdictions are "*required* to publish in the language of the . . . minority group materials distributed to . . . the electorate generally . . . for example . . . petitions." *See* 28 C.F.R. § 19(a) (emphasis added).

the word "ballot" or "election." But it did not. Instead, Congress determined that section 203 applied to "*any* registration or voting notices, forms, instructions, assistance, or *other materials* or information *relating to* the electoral process, including ballots." *Id.* (emphasis added). Under the district court's reading, the meaning of this language would be entirely stripped away, leaving only "voting" and "ballots" as operative words. Such a result would be completely at odds with the general rule of statutory construction requiring that every word in a statute be given full effect. *See Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004) ("We must 'interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.' ") (quoting *Boise Cascade Corp. v. U.S. Envntl. Prot. Agency*, 942 F.2d 1427, 1432 (9th Cir. 1991)). The district court does just this by reading "other materials . . . relating to the electoral process" right out of the statute.

[10] Second, the district court's conclusion that the Voting Rights Act applies only when a vote is cast between two or more alternative choices relies on too restricted a reading of Congress's intent in requiring bilingual voting materials. Such a narrow and crabbed reading of this statute is contrary to the general rule that such remedial statutes are to be broadly construed. *See Allen,* 393 U.S. at 565-66; *see also Tcherepnin*, 389 U.S. at 336. The Supreme Court's decision in *Allen* is instructive here. There the Court concluded that the petition process to place a candidate's name on an electoral ballot constituted a "standard, practice, or procedure with respect to voting" under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. *Allen*, 393 U.S. at 569-70. The recall petition process is comparable to the nomination process at issue in *Allen* as both are preliminary steps to an election. While we are concerned with section 3 of the Voting Rights Act, the language specifically at issue here — "materials . . . *related to* the electoral process" — is at least as broad as that of section 5 —

"standard, practice, or procedure *with respect to* voting" — construed by the Court to include the nomination process. *Compare* 42 U.S.C. § 1973aa-1a(c) (emphasis added), *with* 42 U.S.C. § 1973(c) (emphasis added).

[11] Finally, the district court's reasoning ignores the simple fact that recall petitions *do* implicate a decision between two alternatives, i.e., a choice between (1) recalling the officeholder by signing, and (2) not recalling the officeholder by not signing the petition. California election law requires that a certain percentage of registered voters join in a call to recall an official by signing a valid, pre-approved petition. *See* Cal. Elec. Code § 11221. An effective way to choose to keep a challenged incumbent in office is to refuse to sign the proffered petition, thereby reducing the likelihood that the recall election will occur. Thus, the choice whether to sign or not sign a recall petition can have a tremendous impact on the fate of the incumbent.[11] Indeed, in the First Amendment context, the right to vote is inextricably tied to the right to petition and petition signatures are treated the same as votes for constitutional purposes. *See Green v. City of Tucson*, 340 F.3d 891, 893 (9th Cir. 2003); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186 (1999) (noting that under First Amendment, petition circulation "is core political speech

---

[11]The dissent suggests that people who circulate recall petitions do not have any incentive to exclude others from signing their petitions. Although to some extent this is true, groups like the Recall Proponents in this case have an incentive to misrepresent the character of the petition. Signature gatherers, for personal political reasons or because their compensation for circulating the petition is based on the number of signatures gathered, might induce individuals unwittingly to sign the recall petition. Here, the Recall Proponents disingenuously claimed their petition was an innocuous request by those who signed the petition for additional information concerning Nativo Lopez, the officeholder whose ultimate recall was the goal of the signature gatherers. The dissent also claims that a victim of such misrepresentation could rescind her signature, thereby remedying the injury. That assumes, however, that the non-English speaker would at some point be cognizant of the misrepresentation, which seems unlikely except in rare occasions.

because it involves interactive communication concerning political change" (internal quotations omitted)); *Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.").

### 2.  *"Provided By" the Orange County Elections Department*

Although we conclude that recall petitions relate to the recall process, the Recall Petitions would still only fall under the Act's bilingual requirements if they were "provided by" the Orange County Elections Department. *See* 42 U.S.C. § 1973aa-1a(c). As discussed more fully below, the broad construction requirements for the Act's remedial provisions militates in favor of a conclusion that there was sufficient state involvement to trigger the bilingual requirements.

**[12]** Recall petitions in California are subject to extensive regulations that go beyond imposing mere ministerial duties upon elections officials. *See* Cal. Elec. Code § 11000 et seq. Under these regulations, the state, or in this case the Orange County Elections Department, has the authority and obligation to authorize and approve the form and content of proposed recall petitions, verifying collected signatures, and setting election dates. Cal. Elec. Code § 11042. No signatures may be collected on a recall petition unless and until the Orange County Elections Department notifies the petition's proponents that the form and wording of the proposed petition comply with the Elections Code. § 11042(d).

California's Elections Code mandates a specific format for recall petitions that must be used by recall proponents. Cal. Elec. Code § 11041(a) ("[P]roponents shall use the recall petition format provided by the Secretary of State."). While private persons may print the actual recall petitions, the form must adhere to the statutory requirements, which regulate the content and even the typeface to be used on such petitions.

*See id*. The proponents must file, within ten days of receipt the recall target's answer, two blank copies of the recall petition with the jurisdiction's elections officials. Cal. Elec. Code § 11042(a). Elections officials are charged with ensuring that the proposed petition conforms to the requirements of the Elections Code in both form and content. *See id.* If elections officials determine that a proposed petition does not comply, they must issue written findings. Cal. Elec. Code § 11042(b). In such cases, officials must notify the proponents of the alterations necessary for the petition's approval. Cal. Elec. Code § 11042(c).

The Elections Code also dictates the contents of a recall petition, requiring that each page of the petition include: (1) a request that an election be called to recall an officeholder; (2) a copy of the Notice of Intention; (3) a written statement of the grounds for the recall; (4) the names of at least ten recall proponents that appear on the Notice of Intention; (5) any answer filed by the officer sought to be recalled or a statement that the official did not answer; and (6) the name and title of the officer sought to be recalled. Cal. Elec. Code §§ 11020(a)-(d), 11023(a), 11041(a). California elections officials must also approve the content of the recall petition. *See* Cal. Elec. Code § 11042(a) (charging elections officials with "ascertain[ing] if the proposed form and *wording* of the petition meets the requirements of this chapter" (emphasis added)). Indeed, recall proponents are statutorily required to alter their recall petition as directed by elections officials until elections officials are satisfied that no further alterations are required. *See* Cal. Elec. Code § 11042(c) (mandating that recall proponents correct recall petition as directed by elections officials within ten days until elections official determines that no further alterations are required).

**[13]** California law prohibits *any* private party from circulating a recall petition until the petition receives state approval. *See* Cal. Elec. Code § 11042(d) ("No signature may be affixed to a recall petition until the elections official or, in

the case of the recall of a state officer, the Secretary of State, has notified the proponents that the form and wording of the proposed petition meet the requirements of this chapter."). Signed petitions must be submitted to the proper elections officials for certification. Cal. Elec. Code §§ 11222, 11224, 11227. If enough signatures have been collected, the recall election is called and scheduled by elections officials. *See* §§ 11222, 11224, 11227.

Considering this extensive regulation, it is reasonable to conclude that recall petitions are not the same as fliers or candidate literature wholly created and controlled by private parties. *See Zaldivar*, 780 F.2d at 833 ("That the state or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be voter, the candidate for office, or the proponents of an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature."). Rather, they are more akin to ballots or initiative materials that are distributed by voting districts or to the nomination petition at issue in *Allen*.

**[14]** Here, the Recall Petitions, in English only, were submitted to the Orange County Elections Department as required by California election law. By reviewing and approving the Recall Petition for circulation, the Orange County Elections Department officially sanctioned the content and format of the petition, including its printing only in English.[12] Elections officials could have altered the text of the petition or demanded that the Recall Proponents publish it in Spanish

---

[12]Defendants argue that the Recall Petition is not "provided by" the Orange County Elections Department because the Recall Proponents drafted the Petition's content, with the exception of Lopez's response. This seems to take too narrow a view of "provided." If we were to adopt such a definition, then ballots would also not have to be translated, as the candidates' names, occupations, and political party affiliations are not drafted by the state.

as well as English, but chose not to do this and instead approved the petitions in their English-only form. This state approval, together with the extensive state regulation of the form of the petitions is sufficient state involvement to trigger application of the bilingual requirements and to conclude that the state "provided" the Recall Petition within the meaning of the Voting Rights Act. *See Zaldivar*, 780 F.2d at 833. This conclusion is further bolstered by the requirement that the Voting Rights Act be given broad construction. *See Allen*, 393 U.S. at 565-66.

### D.  *"Chilling Effect"*

Defendants argue that a conclusion that recall petitions fall within section 203's requirements would result in a "chilling effect" on voters by imposing too heavy a burden on recall proponents because of the increased printing costs necessary to distribute petitions in assorted minority languages. We do not believe that such considerations should outweigh the right of every voter to participate in the electoral process. Or, that this is a sufficient reason to justify leaving non-English speaking voters in the dark about the petitions they are solicited to sign. In amending the Voting Rights Act, Congress was responding to a history of language discrimination in voting. It did not suggest that its remedy should be undone because of an increased financial burden on the states or political subdivisions required to comply with its provisions.[13] *See* 42 U.S.C. § 1973aa-1a.

### CONCLUSION

**[15]** "[T]he purpose of the bilingual provisions of the [Voting Rights] Act is to end the language disability of some citi-

---

[13]Furthermore, section 203 does not affect every political subdivision. It only applies to those districts that have significant limited-English proficient populations, as defined by the statute. *See* 42 U.S.C. § 1973aa-1a(b)(2)(A)(i), (ii).

zens to full participation in the electoral process; and to this end, the Act requires information relating to the electoral process to be brought to their attention in both English and the minority language." *Zaldivar*, 780 F.2d at 833. Holding that these bilingual provisions do not apply to recall petitions would deny minority language speakers the right to fully participate in the electoral process by depriving them of the ability to consider the written arguments for and against a particular recall target. *See id.* Such a result runs counter to the very purpose of Congress in remedying minority language discrimination in voting. Accordingly, we hold that section 203 of the Voting Rights Act applies to recall petitions circulated pursuant to California law. The district court's decision to the contrary is **REVERSED** and the cause is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.

---

CANBY, Circuit Judge, dissenting:

With all due respect, I cannot agree with the outcome reached by the majority opinion. I must confess that my approach to the problem is influenced by my conviction that application of § 1973aa-1a(c) of the Voting Rights Act to initiative or recall petitions is inherently perverse; it takes too little account of the incentives that operate on persons circulating and signing, or not signing, such petitions.

I certainly agree with the majority's proposition that "the Voting Rights Act is to be broadly construed so as to achieve the Act's objectives." *Supra*, p. 15501. One major objective is to ensure that citizens of language minorities not be "excluded from participation in the electoral process." 42 U.S.C. § 1973aa-1a(a). Those who circulate recall petitions, however, have no incentive to exclude anyone from signing their petitions. There is no way, and no need, to vote "no" on a recall petition itself; those eligible voters who do not sign, for any

reason, are effectively counted as "no" votes on the question of whether to have an election.[1] The purpose, therefore, of those who circulate recall petitions is to obtain as many signatures as possible in order to precipitate an election that otherwise would not occur. To the extent that they fail to provide translations of their petitions, they take the risk of failure of their enterprise.

It might be argued, however, that minority language voters ought to be able to have the opportunity to sign a petition in their language in order to help precipitate a recall election. It is difficult to see how such an argument can lead to an enforceable right, however. Certainly the circulators have no obligation to present a petition to any particular voter. Again, the incentive operating on the circulator is to reach as many potential voters as possible but if, for any number of reasons, the circulator does not reach an eligible voter and provide an opportunity for that voter to sign the petition, it is hard to see how there has been a violation of voting rights remediable by the Voting Rights Act and the courts. It is equally hard to see how the failure to reach potential signers in their own language gives rise to an enforceable right that can stop an otherwise successful recall effort in its tracks.

The plaintiffs in this case present an unusual variant of an eligible voters' argument. They allege that they signed the petition because of a misrepresentation that it was a request for information rather than a recall petition. This situation is sufficiently extraordinary that it ought not to outweigh the practicalities that will govern most solicitation of signatures for a recall election. There are ample remedies short of enjoining an election to remedy the plaintiffs' alleged injury. One remedy, employed by one of the plaintiffs here, was to rescind her signature. Another, of course, is to vote "no" in

---

[1]The number of signatures needed to precipitate a recall election is calculated as a percentage of the total number of registered voters. Cal. Elec. Code § 11221.

the recall election, where the ballots are required to be printed in both English and Spanish.

The downside of application of § 1973aa-1(a) to initiative and recall petitions is the chilling effect on recalls and initiatives. As the defendants point out, if the Voting Rights Act were to be applied to recall petitions for an office of Orange County, California, petitions would have to be presented in English, Spanish, Vietnamese, Korean and Chinese. It is not at all clear who is to bear the expense of such translation and printing; presumably it would be those who seek the recall. Even aside from the expense, the sheer burdensomeness of the effort is likely to chill petition campaigns and make their success extremely unlikely. If, for example, a substantial minority community has enough members to precipitate a recall election by themselves, it is questionable that they should be burdened with the unnecessary duty to solicit numbers of other minority language speakers in their own languages. Those not solicited will have their chance to participate in the recall election. I fear that the majority's ruling here, rather than opening the electoral process in accord with the intent of the Voting Rights Act, will have a tendency to close it. And the lawsuits it will engender will not be brought by those seeking access to sign a recall petition; they will be brought by plaintiffs like those before us who seek to prevent an election when sufficient signatures have been gathered to precipitate one.

Of course, all of these considerations would not carry weight if it were clear that Congress intended § 1973aa-1a(c) to apply to initiative and recall petitions. That intent is not clear, however; indeed, the words of the statute and the decisions of two of our sister circuits point firmly in the opposite direction. As the majority opinion recognizes, § 1973aa-1a(c) imposes its requirement only on a State or political subdivision subject to the applicable provisions of the Voting Rights Act when that State or subdivision "*provides* . . . any . . . materials of information relating to the electoral process . . . ."

(Emphasis added). It is only those materials provided by the State or subdivision that must be translated into the language of the applicable minority groups. *Id.*

It strains the meaning of these statutory terms to hold, as the majority does, that the State or subdivision "provided" the recall materials merely because they approved them as to form. The petitions themselves originated with, and were supplied by, the non-governmental defendants who caused the petitions to be circulated. Thus the Tenth Circuit held in *Montero v. Meyer*, 861 F.2d 603, 609-10 (10th Cir. 1988), that initiative petitions were not subject to the requirements of § 1973aa-1(c) because they were not provided by the State. The Eleventh Circuit came to the same conclusion in *Delgado v. Smith*, 861 F.2d 1489, 1496 (11th Cir. 1988). I would follow the lead of these two circuits and hold that § 1973aa-1(c) does not apply to the circulation of recall petitions in the present case.

The majority opinion chooses instead to follow the language of our circuit in *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 833-34 (9th Cir. 1986), opining that a statutorily-required notice of intent to precipitate a recall election was subject to § 1973aa-1a. But the issue in *Zaldivar* was whether plaintiffs who brought such a claim and their attorneys were subject to sanctions under Fed. R. Civ. P. 11 for filing a frivolous lawsuit. Indeed, the lead sentence of the paragraph of *Zaldivar* on which the majority relies stated: "Giving section 1973aa-1a the 'broadest possible scope,' . . . we have no difficulty in concluding that a competent attorney, after reasonable inquiry, could argue in good faith that a notice of intention to recall an office holder provides information relating to the electoral process." *Id.* at 833 (citation omitted). *Zaldivar*'s language, therefore, is subject to interpretation as a statement of the attorney's good faith argument. Moreover, the discussion was confined to the notice of intent, not the recall petitions themselves, and dealt only with the requirement of § 1973aa-1a that the materials in issue "relat[ed] to the elec-

toral process." Our case, in contrast, concerns the petitions themselves and the requirement that they be "provided" by the State or its subdivision. *See id. Zaldivar* is therefore distinguishable.

In any event, the language of *Zaldivar* relied on by the majority clearly was dictum. The majority points out that views of the scope of dictum vary, and that our court's solemn pronouncements ought not easily to be disregarded as dictum. With that principle I heartily agree. In the case of *Zaldivar*, however, there is really no room for dispute. The district court in *Zaldivar* had ruled in a summary judgment that § 1973aa-1a did not apply to the recall process, and it added Rule 11 sanctions against the plaintiffs and their attorneys. By the time the appeal was decided by our court, the election had occurred and it appears to have been undisputed that the case on the merits was moot. If there had been any doubt that our *Zaldivar* opinion dealt with the merits of the complaint, it was utterly dispelled by the closing words of our discussion. We said:

> The district court was not persuaded by plaintiffs' arguments. Under the proper legal standard, we do not review the court's decision on the Voting Rights issue for legal error. We hold only that plaintiffs' argument is not frivolous under the first prong of Rule 11.

*Zaldivar*, 780 F.2d at 834.

I have no difficulty accepting the holding of *Zaldivar*; I would not consider the plaintiffs in this case or their attorneys to be subject to Rule 11 sanctions for having brought a frivolous claim. I am convinced, however, that we should join the Tenth and Eleventh Circuits in holding that § 1973aa-1a does not apply to recall (or in their cases initiative) petitions, for all of the reasons I have set forth. I therefore respectfully dissent from the majority's opinion.