# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANDRA PADILLA; VICTOR SANCHEZ;
ROSA ANDRADE,
       *Plaintiffs-Appellants,*

v.

ROSALYN LEVER, in her official
capacity as Registrar of Voters,
Orange County Registration and
Elections Department; SUZANNE
SLUPSKY, in her official capacity as
Assistant Registrar of Voters,
Orange County Registration and
Elections Department,
       *Defendants-Appellees,*

and

VIVIAN MARTINEZ,
       *Defendant-Appellee.*

No. 03-56259

D.C. No.
CV-02-01145-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued and Submitted En Banc
June 22, 2006—San Francisco, California

Filed September 19, 2006

11549

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson, William C. Canby, Jr., Stephen Reinhardt, Alex Kozinski, Diarmuid F. O'Scannlain, Pamela Ann Rymer, Andrew J. Kleinfeld, Raymond C. Fisher, Ronald M. Gould, Richard A. Paez, Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee, and Carlos T. Bea Circuit Judges.

Opinion by Judge Canby;
Concurrence by Judge Reinhardt;
Dissent by Judge Pregerson

## COUNSEL

Nina Perales (argued), Mexican American Legal Defense and Educational Fund, San Antonio, Texas, for the plaintiffs-appellants.

Wendy J. Phillips (argued), Deputy County Counsel, Santa Ana, California; Frederic D. Woocher (argued), Strumwasser & Woocher, LLP, Santa Monica, California; for the defendants-appellees.

George W. Shaeffer, Jr. (argued), Heather B. Scheck (brief), Breon, Shaeffer & Bryant, P.L.C., Irvine, California; Louis R. Mauro, Senior Assistant Attorney General, Sacramento, California, for amici curiae.

## OPINION

CANBY, Circuit Judge:

A provision of the federal Voting Rights Act, 42 U.S.C. § 1973aa-1a(c), requires that, in certain States with substantial linguistic minority populations of voting age, election materials must be provided in the applicable minority languages as well as English. This requirement applies to any covered State or political subdivision that "*provides* any . . . materials or information relating to the electoral process." *Id.* (emphasis added). The question presented by this appeal is whether this requirement attaches to recall petitions initiated, circulated and paid for by private proponents of a recall, when the proponents are required to draft the petitions in a form specified by the State and county.

We conclude that § 1973aa-1a(c) does not apply to such recall petitions because they are not "provide[d]" by the State or its subdivision. We therefore affirm the judgment of the

district court, which rejected the plaintiffs' challenge to a recall election triggered by petitions circulated only in English.

## BACKGROUND

The recall petitions at issue were initiated by defendant Vivian Martinez and others, who sought to recall Santa Ana Unified School District Board Member Nativo Lopez. Pursuant to California Elections Code section 11000 *et seq.*, the proponents drafted and printed (in English) a Notice of Intention to Circulate Recall Petition, which included a statement of the grounds for recall. The proponents filed the Notice with the Orange County Registration and Elections Department and a copy was served on Lopez. In response, Lopez filed an Answer (also in English) with the County Elections Department and served copies on the recall proponents.

The recall proponents then drafted a recall petition in accordance with the California Elections Code and the regulations of the California Secretary of State. The recall petition included a request to hold an election to replace Lopez, the Notice of Intention (including a statement of the reasons for the recall), and Lopez's Answer. Except for Lopez's Answer (which he drafted), the recall proponents drafted the contents of the Recall Petition, adhering to the requirements and format specified by the Secretary of State. This draft petition was in English only.

As required by Cal. Elec. Code § 11042, the recall proponents filed two blank copies of the Recall Petition with the Orange County Elections Department, along with a proof of publication of the Notice of Intention, for election officials to ascertain whether the recall petition conformed to the proper format and applicable election law. *See* Cal. Elec. Code § 11042(a)-(b). The County Elections Department reviewed the proposed form and wording of the petition and concluded that it conformed to the requirements of the California Elec-

tion Code. They accordingly authorized circulation of the petitions. They required no translation, and the authorized petition was printed only in English. The final petitions, also in English, were printed at the proponents' expense.

In April 2002, the proponents began collecting signatures and in September 2002 they submitted the signed petitions to the County Elections Board, which verified the signatures and certified that enough signatures had been collected to precipitate an election. The School District then set a recall election for February 4, 2003.

On December 12, 2002, however, the plaintiffs entered the picture. They are registered voters and residents of the School District whose primary language is Spanish. They filed this action seeking injunctive and declaratory relief against Martinez and the County officials charged with overseeing the recall election. The complaint alleged that the recall petitions did not comply with § 1973aa-1a(c) of the Voting Rights Act because they had not been translated into Spanish. The plaintiffs sought an injunction prohibiting the defendant officials from taking any steps to proceed with the recall election and requiring translation of the recall petition into Spanish.

The plaintiffs alleged that they signed the petitions because the circulators misrepresented the petitions' nature, and the plaintiffs could not fully understand the petitions firsthand because they were printed only in English.

The plaintiffs sought a temporary restraining order to prevent the election, and the district court denied that motion on December 24, 2002. The plaintiffs moved for a preliminary injunction, which the district court denied on January 10, 2003. The plaintiffs appealed and sought to prevent the election by filing an emergency motion for injunction pending appeal, which this court denied on January 30, 2003. The election took place as scheduled on February 4, 2003, and the plaintiffs then voluntarily dismissed their appeal of the denial

of the preliminary injunction. On February 21, 2003, the district court granted defendant Martinez's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Finally, on June 16, 2003, the district court granted the county defendants' motion for judgment on the pleadings. The plaintiffs appealed.

## DISCUSSION

### 1.  *Mootness.*

**[1]** The plaintiffs concede that their claim for injunctive relief has become moot. The recall election has occurred, and the term of office filled by that election has expired. The plaintiffs contend, however, that their claim for declaratory relief is not moot. We conclude that they are correct.

**[2]** The plaintiffs seek a declaration that the Voting Rights Act was violated when the proponents were permitted to, and did, circulate petitions printed only in English. It is too late, of course, for the declaration to have any effect on the recall petitions for the election of February 4, 2003. The plaintiffs' claim for declaratory relief, however, falls classically into that category of cases that survive mootness challenges because they are " 'capable of repetition, yet evading review.' " *Roe v. Wade*, 410 U.S. 113, 125 (1973) (quoting *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911)). That exception applies when "(1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir. 1992).

**[3]** As we observed in *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003), "the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." Here, the petitions were certified as sufficient on September 26, 2002, and the election was held on February 4, 2003 — a period of approximately four and one-half months

during which the plaintiffs could have challenged the threat-ened election.[1] In other contexts, we have held that periods as long as one or two years were insufficient to permit full review of challenged regulations or practices. *See Greenpeace Action*, 14 F.3d at 1329-30 (one year); *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 855 (9th Cir. 1999) (two years).

Here, the plaintiffs vigorously sought prompt review, seek-ing stays in both the district court and our court. Those stays were denied but the plaintiffs did not receive a full adjudica-tion of their claim on the merits. We are reaching the merits of their claim today, some four and one-half years after they filed their complaint. This case evaded review, and likely would again. It is true that in some extraordinary cases, we are able to hear expedited appeals prior to a scheduled elec-tion, *see, e.g.*, *SW Voter Registration Educ. Proj. v. Shelley*, 344 F.3d 914 (9th Cir. 2003) (en banc), but we cannot expect extraordinary responses as a matter of course. " 'Evading review' for the purpose of the exception need not mean that review is impossible. It only means that in the ordinary course of affairs it is very likely to escape review." *Joyner v. Mof-ford*, 706 F.2d 1523, 1527 (9th Cir. 1983).

**[4]** There is also a reasonable expectation that the plaintiffs will again be presented with recall petitions printed only in English. The election officials' practice of not requiring trans-lation remains in place, and recall petitions printed only in English are likely to be circulated in the plaintiffs' district in the future. *See Alaska Right to Life Comm. v. Miles*, 441 F.3d

---

[1]The initiative process itself began with the filing of a Notice of Inten-tion on March 25, 2002, but there was nothing in the Notice of Intention that would indicate whether the recall petition would be translated into languages other than English. The earliest that plaintiffs could conceivably have sued for declaratory relief would have been when the petitions were first circulated in April 2002 — some eleven months before the election. As we point out above, even that period is too short to permit full litiga-tion of the plaintiffs' challenge.

773, 779-80 (9th Cir. 2006) (finding claim not moot because of "sufficient likelihood" that petitioners would have to comply with challenged campaign finance laws in future). This case is not moot.

### 2.   *Recall Petitions and the Voting Rights Act.*

**[5]** The Voting Rights Act of 1965 imposes certain bilingual or multilingual election requirements for "covered" States or political subdivisions. "Covered" States or subdivisions are defined by certain requisite percentages of minority-language citizens of voting age who have limited proficiency in English and whose illiteracy rate is above the national average. *See* 42 U.S.C. § 1973aa-1a(b)(2)(A). There is no dispute that Orange County, California, which conducted the recall election, is a "covered" subdivision.

**[6]** The controversy before us centers on the following provision of the Act:

> Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section *provides* any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language.

*Id.* § 1973aa-1a(c) (emphasis added).[2] We conclude, as did the district court, that the recall petitions circulated by the propo-

---

[2] A complementary prohibition appears earlier in the same section: "Before August 6, 2007, no covered State or political subdivision shall provide voting materials only in the English language." 42 U.S.C. § 1973aa-1a(b)(1).

nents of the recall were not subject to this provision because they were not "provided" by Orange County or the State.[3]

[7] It is true that California regulates recall petitions in some detail. The petitions must follow a format provided by the Secretary of State, and must use a minimum type size. *See* Cal. Elec. Code § 11041(a). The petition also must include a copy of the Notice of Intention, the statement of grounds for recall, and the answer of the targeted officer if the officer submitted one. *Id.* at § 11041(a)(2), (3). But these regulations do not mean that the petitions are *provided* by the State or subdivision. The form is regulated by the State, but the proponents fill out the petition, supply the grounds of recall, and have the petitions printed at their own expense. The fact that, under Cal. Elec. Code § 11041(a), the Secretary of State "provides" the format does not mean that the State "provides" the petitions themselves within the meaning of the Voting Rights Act.

[8] The plaintiffs argue that, because the election officials are charged under state law with ascertaining whether "the proposed form and *wording* of the petition meets the requirements of this chapter[,]" Cal. Elec. Code § 11042(a) (emphasis added), they are dictating the content of the petitions to the degree that the petitions may be said to be "provided" by the County. But there is nothing in the chapter governing elections that specifies the actual wording that proponents must use, for example, in stating their grounds for recall. Nor does the record contain any hint that the election officials determine the contents of the petition; they merely make sure that the petitions are in the form specified by statute. It is not reasonable to hold that this regulatory process transforms petitions privately initiated, drafted, and circulated by the proponents into petitions "provided" by the County for purposes of the Voting Rights Act.

---

[3]Our conclusion makes it unnecessary for us to address the question whether recall petitions meet a second requirement of § 1973aa-1a(c): that they qualify as "materials . . . relating to the electoral process."

Our conclusion does not conflict with our decision in *Zaldivar v. City of Los Angeles*, 780 F.2d 823 (9th Cir. 1986), *overruled on other grounds by Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990). In that case the complaint alleged that § 1973aa-1a applied to a Notice of Intention to seek a recall election. *Id.* at 826-27. We did not rule on that point; we ruled only that an attorney who signed the complaint could not be sanctioned under Fed. R. Civ. P. 11 for filing a frivolous lawsuit.[4] *See id.* at 833. That a claim is not frivolous does not establish that it is meritorious.

Our conclusion that the County did not "provide" the recall petitions is not only consistent with *Zaldivar*, it is directly supported by the decisions of two of our sister circuits. The Tenth Circuit held in *Montero v. Meyer*, 861 F.2d 603, 609-10 (10th Cir. 1988), that initiative petitions were not subject to the requirements of § 1973aa-1(c) because they were not provided by the State. The Eleventh Circuit came to a similar conclusion in *Delgado v. Smith*, 861 F.2d 1489, 1496 (11th Cir. 1988).[5] No circuit authority to the contrary has been cited to us, and we have found none.

---

[4]The dissent errs in relying on our dicta in *Zaldivar* in the absence of any other precedent supporting its argument. (Dissent at 11572, 11577). Beyond its narrow holding, *Zaldivar*'s dicta were confined to whether it was frivolous to view the Notice of Intention as "relating to the electoral process," and did not address the question whether it was "provided" by the City. *Zaldivar*, 780 F.2d at 833.

[5]The dissent argues that *Montero* and *Delgado* are "readily distinguishable" because "California's statutory scheme is more stringent than those in Colorado or Florida, making [it] . . . more than 'merely ministerial.' " (Dissent at 11579). Notwithstanding the dissent's assertion, the California Court of Appeal has characterized local election officials' duties as "purely ministerial" and said that such officials are authorized only "to review a petition as submitted for compliance with procedural requirements" and are foreclosed from making "decisions that are discretionary or go beyond a straightforward comparison of the submitted petition with the statutory requirements for petitions." *Alliance for a Better Downtown Millbrae v. Wade*, 108 Cal. App.4th 123, 133 (2003); *see also Farely v. Healey*, 67 Cal. 2d 325, 327 (1967)(Traynor, C.J.) ("The right to propose initiative measures cannot properly be impeded by a decision of a ministerial officer . . . that the subject is not appropriate for submission to voters.").

The plaintiffs argue that the Justice Department has supported their view in its regulation describing the types of materials that must be provided in a minority language. The regulation states in part:

> A jurisdiction required to provide minority language materials is only required to publish in the language of the applicable language minority group materials distributed to or provided for the use of the electorate generally. Such materials include, for example, ballots, sample ballots, informational materials, and *petitions*.

28 C.F.R. § 55.19(a) (1999) (emphasis added). We are not convinced that this regulation encompasses recall petitions initiated, drafted and circulated by citizens. Moreover, we have been directed to no instances in which the Department of Justice has attempted to impose translation requirements on recall petitions in the several decades that § 1973aa-1a has been in existence. In any event, the ultimate determination is what Congress meant by imposing requirements on materials "provided" by the State or its subdivision. That term simply cannot reasonably be construed to apply to recall petitions initiated, drafted and circulated by private citizens.

[9] We hold, therefore, that § 1973aa-1(a) does not apply to the recall petitions in this case. The language and structure of the statute compel our decision. We note in addition that there are sound practical reasons supporting what we conclude is an inevitable interpretation of the statute.

[10] It distorts § 1973aa-1a to apply it in a situation for which it clearly is not intended. Those who circulate recall petitions have an incentive to gather as many signatures as they can,[6] but they are under no legal duty to do so, just as

---

[6]Any signature of a registered voter that the proponents fail to obtain counts as a "no" vote on the question whether to have a recall election. The number of signatures needed to precipitate a recall election is calculated as a percentage of the total number of registered voters in the affected district. *See* Cal. Elec. Code § 11221.

they were under no duty to launch a recall process at all. No one, including the plaintiffs, suggests that the proponents have any duty to present a petition to any particular voter, or to solicit in any particular neighborhood. The plaintiffs in fact concede that they have no right to have a petition presented to them; they insist only that they have a right to be provided a translation with any petition that *is* presented to them. But when the Voting Rights Act creates no duty to present a petition to the plaintiffs in the first place, it is difficult to see why the Act requires the petition to be translated into their language.

A requirement of translation for recall petitions is far more likely to be used as a sword than a shield, as in the case of the plaintiffs here, who brought their suit to stop an election for which sufficient signatures had been collected. The plaintiffs complain that they were deceived as to the nature of the petition, and this deception caused them to sign it. There are, however, avenues of relief available to the plaintiffs that do not threaten the recall process itself. One is to rescind the signature, as one of the plaintiffs here did, by filing a written request with the election officials prior to the day the petition section bearing the signature is filed. *See* Cal. Elec. Code § 11303. Another, ultimate resort is to vote "no" in the recall election.

**[11]** Finally, a translation requirement is very likely to have a chilling effect on the petition process itself. If translation is required in Orange County, recall petitions will have to be printed, at a minimum, in English, Spanish, Vietnamese, Korean and Chinese.[7] There is no provision in state law or the

---

[7]The dissent here understates the problem by pointing out that the election officials failed to require translation of the petitions into Spanish, and that the County's regulation of the process triggers the "bilingual requirements" of the Voting Rights Act. (Dissent at 11578). If § 1973aa-1a were held to apply to the petitions in this case, they would have to be circulated in five languages, whether or not the petitions were presented to speakers of all of those languages.

Voting Rights Act requiring the County to bear the costs; printing of recall petitions is done at the expense of the proponents, as in the present case. The expense and trouble of fulfilling the translation requirements are likely to deter proponents who otherwise would launch petitions. When that happens, then application of § 1973aa-1a will have had a perverse effect: it will have prevented, rather than promoted, participation in the electoral process.

We are satisfied, therefore, that our interpretation of § 1973aa-1a is not only compelled by its language but also reaches the most practical result in light of the nature of the recall petition process.

## CONCLUSION

The judgment of the district court is

AFFIRMED.

---

REINHARDT, Circuit Judge, concurring:

The plain meaning of the language of the Voting Rights Act compels me to concur in the result reached by the majority, because neither the State of California nor the County of Orange "provided" the recall petition at issue in this case. Rather, as the majority holds, the petition was funded, drafted, printed, and circulated — i.e., provided — by the private proponents of the recall, although in conformance with the relevant provisions of the California Elections Code. In view of the unambiguous provisions of 42 U.S.C. § 1973aa-1a(c), that is all the majority needs to say. Instead of stopping when it is ahead, however, the majority continues on and seeks to support its decision on practical and policy grounds. I write separately because I disagree with the additional justifications it advances. Also, I wish to note my agreement with the dissent

regarding an important issue not reached by the majority: There can be no doubt that recall petitions "relate to" the electoral process.

I strongly disagree with the majority's statement that its construction of the statute, in addition to being compelled by the statutory language, is supported by "sound practical reasons." *See* maj. at 11561. To the contrary, I believe that the result we are required to reach is *not* consistent with the objectives of the Voting Rights Act and that common sense and practicality would support Congress's extension of the Act to cover a process that was initially omitted, inadvertently or otherwise, but that is integral to the electoral system. The majority contends that a contrary reading of the statute would (1) "distort" the Voting Rights Act by "apply[ing] it in a situation for which it clearly is not intended," and (2) have a chilling effect on the petition process because "[t]he expense and trouble of fulfilling the translation requirements are likely to deter proponents who otherwise would launch petitions." Maj. at 11562-63. I fully agree with Judge Pregerson's dissent in its rejection of both contentions.

First, requiring that recall petitions be provided in a manner that ensures that as many citizens as possible are able to participate in the recall process would not, as the majority asserts, "distort" the Voting Rights Act. As Judge Pregerson notes in dissent, the purpose of the relevant provision of the Act is to guarantee that language minorities have the ability to exercise fully their fundamental democratic rights. It would be difficult to imagine how fostering the electoral participation of such minorities by allowing them to read and understand relevant voting materials would distort that purpose. To the contrary, encouraging large numbers of previously excluded but eligible voters to participate in an important aspect of the electoral system would be wholly consistent with the purposes of the Act.

The majority also suggests that there was no reason for Congress to cover recall petitions because, although proponents have no legal duty to present language minorities with petitions, they "have an incentive to gather as many signatures as they can." Maj. at 11561. That this case is now before us is evidence of how wrong the majority is. Sponsors of petitions, including those who provided the petitions in the present case, have a strong incentive not to precipitate heated debate or angry confrontations when attempting to collect signatures on controversial or divisive measures.[1] In recent years, California has had a number of highly controversial initiatives, some successful, designed to curtail the rights of minorities.[2] Opponents of these initiatives have accused the proponents of using deceptive advertising and solicitation techniques in their efforts to collect signatures and support. The proponents are said to have represented these measures as being innocuous or even as advancing or protecting minority rights. Whether or not such accusations are well-founded, the ability to obtain signatures for a petition is aided when the communities adversely affected by the initiative or, in this case, the recall, are not confronted directly by the petition in a form in which they are able to perceive its true meaning and potential impact.

More important, it is irrelevant whether recall proponents have an incentive to exclude eligible voters. The pertinent question is whether language minorities are in fact kept from meaningful or actual participation in the electoral process because they cannot read the voting materials. Here, the contention is that Spanish-speaking voters were duped into signing a petition to recall a Latino elected official whom they

---

[1]Signature gatherers frequently station themselves outside of supermarkets, discount stores, movie theaters, or public arenas where numerous people of varying backgrounds are present.

[2]Examples include Proposition 209, the self-labeled "California Civil Rights Initiative," and Proposition 187, the so-called "Save our State" initiative which related to undocumented persons.

supported. Thus, although they participated in the electoral process in some bare sense, their participation cannot be characterized as informed or meaningful. Also, many other non-English speakers were likely prevented from participating in the process in *any* manner as a result of their inability to read or understand the petition. Accordingly, although the law may not currently require recall proponents to translate the petitions they provide, English-only petitions plainly serve to exclude eligible and registered citizens from an important part of the voting process. Surely such a phenomenon is not consistent with the purpose of the Voting Rights Act.[3]

Second, I disagree with the majority's assertion that mandating translation of recall petitions in language-diverse municipalities would chill the recall process. As Judge Pregerson's dissent points out, the minimal cost of translating less than a page of text can hardly be deemed a substantial burden on the proponents of a recall. To this I would add that the majority seems to assume that implementing measures promoting fairness in the electoral process is a less important value than adding items to the ballot that are placed there in violation of the spirit of the Voting Rights Act. I disagree. There are many provisions designed to regulate recall and other elections that may in practice affect the number of measures or individuals who qualify for a place on the ballot, including provisions that limit the right to raise and spend funds; require proponents to obtain a certain number of signatures, sometimes in the hundreds of thousands; and restrict the arguments or explanations that may be offered in the qualifying papers.[4] To the extent that such rules reduce the number

---

[3]It is true, as the majority points out, that citizens do not have a right to have recall, initiative, or candidate petitions presented to them for their consideration. However, when persons are excluded from an important part of the electoral process because of their race, religion, ethnicity, or language minority status, the values inherent in both the Constitution and the Voting Rights Act are seriously undermined.

[4]In addition, fees are imposed for the certification of petitions, refundable should the sponsors be successful in placing the issue on the ballot. CAL. ELEC. CODE § 9004.

of candidates, issues, or recalls, the electorate is not chilling rights or preventing participation in the electoral process. Rather, it is favoring electoral fairness and other similarly important democratic values. Specifically, even if the proponents of recalls or initiative measures are required to bear some additional financial cost, the translation of recall petitions into the languages spoken by significant minorities (and, in some cases, majorities) would enhance the recall procedure: The translations would allow and encourage otherwise-excluded, eligible voters to play a part in the process of placing items on the ballot, and thus would significantly advance the objectives of the Voting Rights Act.

As to the issue the majority does not reach, I would hold, as would the dissent, that California recall petitions are voting materials "relating to the electoral process." 42 U.S.C. § 1973aa-1a(c). First, courts have routinely, and in a variety of contexts, construed the term "relating to" broadly. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397-98 (1967) (construing a "relating to" clause broadly in the arbitration context); *Luu-Le v. INS*, 224 F.3d 911, 916 (9th Cir. 2000) (recognizing that the term "relating to" is to be construed broadly in the immigration context); *Tachiona v. United States*, 386 F.3d 205, 220 (2d Cir. 2004) (noting that the term "relating to," "when used in statutes," is construed broadly to mean "connection with," "reference to," or "association with"). Further, we have previously squarely rejected the defendants' argument that the preliminary nature of recall petitions permits them to escape coverage by the Voting Rights Act: "The argument that a recall notice is only a preliminary step to voting and therefore is unaffected by the bilingual provisions of the Act is without merit." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 833 n.11 (9th Cir. 1986). At least one state apparently agrees: Massachusetts pays the cost of producing recall petitions and, pursuant to the Voting Rights Act, provides translations in minority languages. *See Delgado v. Smith*, 861 F.2d 1489, 1497 n.7 (11th Cir. 1988) (acknowledging that Massachusetts complies with the Act by

translating its initiative and referendum petitions). In addition, not only has the Attorney General expressly acknowledged that petitions are qualifying voting materials, *see* 28 C.F.R. § 55.19(a), but common sense dictates that, where a petition is a necessary predicate to an election and is governed by exacting state election statutes, the petition "relates to" the voting process of that state. In light of our obligation to construe the Voting Rights Act broadly so as to effectuate its remedial purposes, *see Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), I see no reasonable argument that recall petitions are not voting materials relating to the electoral process in California.

As Judge Pregerson notes in his dissent, the Voting Rights Act was designed to apply "throughout the electoral process." *See* H.R. Rep. No. 102-655 (1992). Regrettably, the plain and inescapable meaning of the statutory language requires me to conclude that, with respect to the issue before us, the Act falls short of its objective. Thus, reluctantly, I must concur. I need not, however, join the majority in its assertion that Congress's omission constitutes sound public policy.

---

PREGERSON, Circuit Judge, dissenting:

I respectfully dissent. I read section 203 of the Voting Rights Act, 42 U.S.C. § 1973aa-1a, to require the translation of recall petitions circulated in areas with significant limited-English proficient voter populations. In this case, the purpose of the Voting Rights Act was undermined when the recall petitions were printed only in English and limited-English proficient voters were deprived of their right to fully understand a petition they were solicited to sign.

## I.   The Voting Rights Act of 1964

In 1975, Congress amended the Voting Rights Act to include section 203, which requires certain jurisdictions to

provide bilingual voting materials. *See* 42 U.S.C. § 1973aa-1a*; Zaldivar v. City of Los Angeles*, 780 F.2d 823, 826 (9th Cir. 1986), *overruled on other grounds by Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990). Section 203's broad remedial purpose was directed at a problem that continues to confront many United States citizen immigrants. Specifically, their "inability or limited ability to read English obviously thwarts any attempt to knowledgeably participate in the electoral process." H.R. Rep. No. 102-655, at 3 (1992). It is clear that Congress understood the severity of the wrong inflicted on limited-English proficient voters: "The inability of members of language minority populations to comprehend the ballot and voting related information provided solely in English prevented and continues to prevent them from casting an effective vote." *Id*. at 5. "[T]he use of English, as the sole language throughout the electoral process, continues to be discriminatory and has a direct and invidious impact upon the ability of such populations to participate actively in the electoral process." *Id.* Thus, section 203 was enacted with a broad remedial purpose: "to ensure that language minority populations have substantive access to the ballot." *Id*.

Permitting the use of English-only petitions contravenes the Voting Rights Act, which Congress designed for use "throughout the electoral process." *Id.* In essence, English-only petitions would perpetuate the very injustice the Voting Rights Act seeks to eliminate — the exclusion of "single language minority" voters from a vital stage of the electoral process. 42 U.S.C. § 1973aa-1a(b)(2)(A). I do not believe that this was Congress's intent. The majority's interpretation gives voters proficient in English a preference over limited-English proficient voters. Indeed, the majority entirely writes off full participation by significant portions of the voting population in the recall process.

## II. The Voting Rights Act and Recall Petitions

Section 203 of the Voting Rights Act requires translation into the jurisdiction's minority language(s) whenever a state

or political subdivision "provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots." 42 U.S.C. § 1973aa-1a(c). Thus, the essential questions here are: (1) whether recall petitions are "other materials or information relating to the electoral process," and (2) whether the Orange County Elections Department "provided" the recall petitions.

As a remedial statute, the Voting Rights Act is to be construed broadly so as to achieve the Act's objectives. *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes."). The Supreme Court has explained that "[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections,* 393 U.S. 544, 565 (1969) (footnote omitted). Thus, in *Allen*, the Supreme Court "reject[ed] a narrow construction . . . to § 5 [of the Voting Rights Act]" and concluded that "the [Voting Rights] Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.' " *Id.* at 565-66.[1] It is this well-established canon of statutory construction that must guide the analysis here.

---

[1]The Court further explained that

> Congress knew that some of the States covered by § 4(b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself.

*Id.* at 565 n.30 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 335 (1966)).

### A.    Recall Petitions Are "Voting Materials"

Section 203 defines "voting materials" to "mean[ ] registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots." 42 U.S.C. § 1973aa-1a(b)(3)(A). It does not, however, define what constitutes "other materials or information relating to the electoral process." *Id.* Where a statute fails to define a key term, this court's "duty, in matters of statutory construction, is to give effect to the intent of Congress." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (quoting *A-Z Int'l v. Phillips*, 323 F.3d 1141, 1146 (9th Cir. 2003)). "To this end, 'it is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms.' " *Id.* (quoting *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231-32 (9th Cir. 2003)). "When a statute does not define a term, a court should construe that term in accordance with its 'ordinary, contemporary, common meaning.' " *Id.* (quoting *A-Z Int'l*, 323 F.3d at 1146 (citation omitted)). "Only if an ambiguity exists in the statute, or when an absurd construction results, does this court refer to the statute's legislative history." *Id.*

"To determine the 'plain meaning' of a term undefined by a statute, resort to a dictionary is permissible." *Id.* Black's Law Dictionary defines "related" to mean "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." Black's Law Dictionary 1289 (6th ed. 1991). Supreme Court and Ninth Circuit precedent suggest that this broad definition of "related" is an appropriate one to use here. *See, e.g., Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992) (noting that ordinary meaning of "relating to" is "a broad one"); *Aloha Islandair Inc. v. Tseu*, 128 F.3d 1301, 1302 (9th Cir. 1997) ("The phrase 'relating to' should be construed broadly to mean 'has a connection with or reference to.' "). Based on this reading,

recall petitions clearly have some "bearing or concern" and are "connected with" an election. Indeed, recall petitions serve no other purpose than to trigger an election. As this court has explained,

> The election itself is merely the culmination of th[e electoral] process. It includes those acts that a citizen must perform to establish his eligibility as a voter, as well as those acts that a candidate must perform to place his name on the ballot. The range of conduct "relating to the elector[ ]al process" includes, for example, compliance by a would-be voter with statutes regulating registration and compliance with other statutes to place a name or an issue on the ballot. That the state or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be voter, the candidate for office, or the proponents of an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature.

*Zaldivar*, 780 F.2d at 833. *Zaldivar* rejected "[t]he argument that a recall notice is only a preliminary step to voting and therefore is unaffected by the bilingual provisions of the [Voting Rights] Act." *Id.* at 833 n.11.

Looking beyond the statutory text, in the Department of Justice's regulations implementing section 203, the U.S. Attorney General has defined "written materials" to "include, for example, ballots, sample ballots, informational materials, and *petitions*." 28 C.F.R. § 55.19(a) (emphasis added). While the Attorney General's views are not binding on this court, they are persuasive and bolster the conclusion that recall petitions are "other materials relating to the electoral process." Furthermore, it is important to note that courts owe consider-

able deference to the Attorney General's construction of the Voting Rights Act, particularly where the language of that interpretation mirrors the Act's own language. *See United States v. Sheffield Bd. of Comm'rs*, 435 U.S. 110, 131-32 (1978); *City of Pleasant Grove v. United States*, 479 U.S. 462, 468 (1987) (noting that the Attorney General's interpretation of the Voting Rights Act is entitled to considerable deference and that "Congress was aware of the Attorney General's view in this regard, and implicitly approved it, when it reenacted the Voting Rights Act in 1982").[2] The Attorney General's inclusion of the word "petition" in the definition of "written materials" is consistent with the Justice Department's position that the Voting Rights Act's purpose is to "enable members of applicable language minority groups to participate effectively in the electoral process." 28 C.F.R. § 55.2(b).[3]

---

[2]In *Sheffield*, the Court explained,

> What is perhaps a more compelling argument concerning the original, and subsequent, congressional understanding of the scope of § 5 is that the Attorney General has, since the Act was adopted in 1965, interpreted § 5 as requiring all political units in designated jurisdictions to preclear proposed voting changes. This contemporaneous administrative construction of the Act is persuasive evidence of the original understanding, especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress. In recognition of the Attorney General's key role in the formulation of the Act, this Court in the past has given great deference to his interpretations of it.

*Sheffield Bd. of Comm'rs*, 435 U.S. at 131 (footnotes and citations omitted).

[3]Defendants argue that these regulations are not a "requirement" because the same regulations also provide that "[t]he determination of what is required for compliance with section . . . 203[(c)] is the responsibility of the affected jurisdiction. These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction." 28 C.F.R. § 55.2(c). But, Defendants place too much importance on this language. First, nothing in the record suggests that Defendants engaged in any analysis regarding the applicability of section 203 to the recall petition in this case. Second, the language cited by Defendants does not diminish that regulation's minimum requirement that affected jurisdictions are "*required* to publish in the language of the . . . minority group materials distributed to . . . the electorate generally . . . for example . . . petitions." 28 C.F.R. § 19(a) (emphasis added).

The district court's conclusion that the Voting Rights Act applies only when a vote is cast between two or more alternative choices relies on too restricted a reading of Congress's intent in requiring bilingual voting materials. Such a narrow reading of this statute is contrary to the general rule that such remedial statutes are to be broadly construed. *See Allen,* 393 U.S. at 565-66; *see also Tcherepnin*, 389 U.S. at 336. The Supreme Court's decision in *Allen* is instructive here. There the Court concluded that the petition process to place a candidate's name on an electoral ballot constituted a "standard, practice, or procedure with respect to voting" under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. *Allen*, 393 U.S. at 569-70. The recall petition process is comparable to the nomination process at issue in *Allen* as both are preliminary steps to an election. While we are concerned with section 203 of the Voting Rights Act, the language specifically at issue here — "materials . . . *related to* the electoral process," 42 U.S.C. § 1973aa-1a(c) (emphasis added) — is at least as broad as that of section 5 — "standard, practice, or procedure *with respect to* voting," 42 U.S.C. § 1973(c) (emphasis added) — construed by the Court to include the nomination process.

The district court's reasoning also ignores the simple fact that recall petitions *do* implicate a decision between two alternatives, i.e., a choice between (1) recalling the officeholder by signing, and (2) not recalling the officeholder by not signing the petition. California election law requires that a certain percentage of registered voters join in a call to recall an official by signing a valid, pre-approved petition. *See* Cal. Elec. Code § 11221. An effective way to choose to keep a challenged incumbent in office is to refuse to sign the proffered petition, thereby reducing the likelihood that the recall election will occur.[4] Thus, the choice whether to sign or not sign a recall

---

[4]The majority notes that people who circulate recall petitions have an incentive to "gather as many signatures as they can." Maj. Op. at 11561. By the same token, however, signature gatherers have an incentive to fraudulently induce individuals to sign a recall petition, for political reasons or because their compensation for circulating the petition is based on the number of signatures gathered. *See* below, Part IV.

petition can have a tremendous impact on the fate of the incumbent. Indeed, in the First Amendment context, the right to vote is inextricably tied to the right to petition and petition signatures are treated the same as votes for constitutional purposes. *See Green v. City of Tucson*, 340 F.3d 891, 893 (9th Cir. 2003); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186 (1999) (noting that under First Amendment, petition circulation "is core political speech because it involves interactive communication concerning political change" (internal quotations omitted)); *Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."). Given the importance of petitions to recall procedure, they should be deemed "voting materials" that a person solicited has a right to understand.

## B. "Provided By" the Orange County Elections Department

Although I believe that recall petitions relate to the recall process, the recall petitions would only fall under the Act's bilingual requirements if they were "provided by" the Orange County Elections Department. 42 U.S.C. § 1973aa-1a(c). Because the state's acquiescence in the content of recall petitions is a condition precedent to its circulation, I believe the state provides recall petitions to the public.

Recall petitions in California are subject to extensive regulations that go beyond imposing mere ministerial duties upon election officials. *See* Cal. Elec. Code § 11000-11047. Under these regulations, the state, or in this case the Orange County Elections Department, has the authority and obligation to authorize and approve the form and content of proposed recall petitions, verify collected signatures, and set election dates. *See* Cal. Elec. Code § 11042, 11043. No signatures may be collected on a recall petition unless and until the Orange County Elections Department notifies the petition's propo-

nents that the form and wording of the proposed petition comply with the Elections Code. *See* Cal. Elec. Code § 11042(d).

California's Elections Code mandates a specific format for recall petitions that must be used by recall proponents. *See* Cal. Elec. Code § 11041(a) ("[P]roponents shall use the recall petition format provided by the Secretary of State."). While private persons may print the actual recall petitions, the form must adhere to the statutory requirements, which regulate the content and even the typeface to be used on such petitions. *See id.* The proponents must file, within ten days of receipt the recall target's answer, two blank copies of the recall petition with the jurisdiction's election officials. *See* Cal. Elec. Code § 11042(a). Election officials are charged with ensuring that the proposed petition conforms to the requirements of the Election Code in both form and content. *See id.* If election officials determine that a proposed petition does not comply, they must issue written findings. *See* Cal. Elec. Code § 11042(b). In such cases, officials must notify the proponents of the alterations necessary for the petition's approval. *See* Cal. Elec. Code § 11042(c).

The Elections Code also dictates the contents of a recall petition, requiring that each page of the petition include: (1) a request that an election be called to recall an officeholder; (2) a copy of the Notice of Intention; (3) a written statement of the grounds for the recall; (4) the names of at least ten recall proponents that appear on the Notice of Intention; (5) any answer filed by the officer sought to be recalled or a statement that the official did not answer; and (6) the name and title of the officer sought to be recalled. *See* Cal. Elec. Code §§ 11020(a)-(d), 11023(a), 11041(a). California election officials must also approve the content of the recall petition. *See* Cal. Elec. Code § 11042(a) (charging election officials with "ascertain[ing] if the proposed form and *wording* of the petition meets the requirements of this chapter" (emphasis added)). Indeed, recall proponents are statutorily required to change their recall petition as directed by election officials

until the officials are satisfied that no further alterations are required. *See* Cal. Elec. Code § 11042(c).

California law prohibits *any* private party from circulating a recall petition until the petition receives state approval. *See* Cal. Elec. Code § 11042(d) ("No signature may be affixed to a recall petition until the elections official or, in the case of the recall of a state officer, the Secretary of State, has notified the proponents that the form and wording of the proposed petition meet the requirements of this chapter."). Signed petitions must be submitted to the proper election officials for certification. *See* Cal. Elec. Code §§ 11222, 11224, 11227. If enough signatures have been collected, the recall election is called and scheduled by election officials. *See id.*

Considering this extensive regulation, I can only conclude that recall petitions are not the same as fliers or candidate literature wholly created and controlled by private parties. *See Zaldivar*, 780 F.2d at 833 ("That the state or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be voter, the candidate for office, or the proponents of an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature."). Rather, they are more akin to ballots or initiative materials that are distributed by voting districts or to the nomination petition at issue in *Allen*.

Here, the recall petitions, in English only, were submitted to the Orange County Elections Department as required by California law. By reviewing and approving the Recall Petition for circulation, the Orange County Elections Department officially sanctioned the content and format of the petition, including its English-only printing.[5] Election officials could

---

[5]Defendants argue that the recall petition was not "provided by" the Orange County Elections Department because the recall proponents here

have altered the text of the petition or demanded that the recall proponents publish it in Spanish as well as English, but chose not to do this and instead approved the petitions in their English-only form. This state approval, together with the extensive state regulation of the form of the petitions is sufficient state involvement to trigger application of the bilingual requirements and to conclude that the state "provided" the Recall Petition within the meaning of the Voting Rights Act.

## III.   Relevant Case Law

The majority states that its holding is supported by two out-of-circuit cases. Maj. Op. at 11560. In the first case, *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988), the Tenth Circuit held that initiative petitions do not fall under the Voting Rights Act's bilingual requirements. *See id.* at 609-10. In *Montero*, the plaintiffs challenged initiative petitions circulated by members of the Official English Committee seeking to amend the Colorado Constitution to make English the state's official language. *See id.* at 605. According to the Tenth Circuit, the "electoral process" did not commence until a measure qualified for placement on the ballot and signing an initiative petition was not "voting" within the meaning of the Voting Rights Act. *Id.* at 607. The court further held that petitions were not "provided by" the state such as to make the minority language provisions operable. *Id.* at 609-10. Rather, the court reasoned that the state's actions in approving the initiative petitions were merely "ministerial" and did not alter the character of the petitions or render their circulation "state action." *Id.* at 610.

Employing similar reasoning, the Eleventh Circuit reached the same conclusion in *Delgado v. Smith*, 861 F.2d 1489 (11th

drafted the petition's content, with the exception of Lopez's response. This seems to take too narrow a view of "provided." Under such a definition, ballots would not have to be translated, as the candidates' names, occupations, and political party affiliations are not drafted by the state, but rather only "ministerially" assembled onto the ballot.

Cir. 1988). Like *Montero*, *Delgado* also involved a proposed citizen initiative to make English the official language of Florida. *See id.* at 1491. The court concluded that the Voting Rights Act did not apply because Congress did not intend the bilingual requirements to apply to private citizens. *See id.* at 1492. In addition, Florida election officials' involvement in approving the initiatives was "ministerial" and did not constitute "state action." *See id.* at 1495-96. Thus, the initiative to amend Florida's Constitution to make English the state's official language did not require translation into minority languages under the Voting Rights Act. *See id.* at 1498.

Those two cases are readily distinguishable from the instant case. First, California's statutory scheme is more stringent than those in Colorado or Florida, making the Orange County Elections Department's approval of the Recall Petition more than "merely ministerial." Neither Florida's nor Colorado's statutory and regulatory schemes governing initiative petitions are structurally equivalent to California's scheme. For example, under Florida law, Florida election officials are limited to verifying only that a proposed initiative petition complies with applicable format requirements; the regulations do not provide for a review of the petition's contents. *See* Fla. Admin. Code Ann. r. 1S-2.009(1) ("The Division shall review the form for sufficiency of the format only."). In contrast, California election officials are charged with authorizing and approving the form and content of the recall petition. *See* Cal. Elec. Code § 11042(a) (charging election officials with "ascertain[ing] if the proposed form and *wording* of the petition meets the requirements of this chapter") (emphasis added).

While Colorado empowers election officials to suggest revisions to a petition's content, such revisions are merely suggestions: recommendations made regarding format or content are discretionary to the petitioner. *See* Colo. Rev. Stat. § 1-40-105(2) ("[T]he proponents *may amend* the petition in response *to some or all* of the comments of the directors of the legislative council and the office of legislative legal ser-

vices, or their designees.") (emphasis added). Unlike Colorado, California recall proponents are statutorily required to alter their recall petition as directed by election officials until those officials are satisfied that no further alterations are required. *Compare* Cal. Elec. Code § 11042(a), (c), *with* Colo. Rev. Stat. § 1-40-105(2).

Not only are the cases distinguishable, but they demonstrate the problem with excluding pre-election petitions from section 203's requirements for translation. Both *Montero* and *Delgado* concerned petitions to qualify English-only initiatives to amend their respective state constitutions. These cases ironically excluded limited-English proficient voters from knowledgeably deciding whether to sign a petition for a ballot which sought to enshrine an English-only requirement into their state constitutions. Such a result cannot be what Congress intended when it enacted section 203 to remedy past language discrimination in voting practices by enforcing the guarantees of the Fourteenth and Fifteenth Amendments to the Constitution and to ensure that citizens of language minorities are no longer effectively excluded from full participation in the electoral process. *See* 42 U.S.C. § 1973aa-1a(a).

## IV.   Fraud

It is important to emphasize the fraud that occurred in this case. Here, the recall proponents disingenuously claimed that those who signed the petition would receive information about Nativo Lopez, a school board member. Instead, those voters were signing a petition to recall Lopez. Because the petition's signers were limited-English proficient voters, they were unable to determine whether they were being deceived.

Fraud-prevention lies at the heart of the Voting Rights Act because the Act ensures that all voters — including minority language speakers — have equal opportunities to understand voting materials. The majority minimizes this problem, suggesting that other means of remedying petition fraud exist.

Maj. Op. at 11562. But the fact that multiple remedies exist does not mean Congress did not intend section 203 to remedy fraud. Moreover, the majority's suggestion that every deceived signer may rescind his or her signature and report the incident, as one voter did in this case, is unworkable. That "remedy" assumes that the non-English speaker would at some point recognize that he or she had been tricked, which seems unlikely except in rare occasions. Furthermore, imagine the havoc it would wreak on election results and voter confidence to have entire elections questioned months, if not years, after an elected official took office because of fraudulently induced petition signatures. It is clearly preferable to avoid such problems *before* actual recall and initiative elections by taking the simple step of ensuring that all voters have equal access to information and are protected from the sort of discriminatory practices and exclusions the Voting Rights Act was designed to prevent.

This case demonstrates why section 203 must be interpreted to require the translation of petitions. Congress has recognized that "without a *federal* mandate, much needed bilingual assistance in the voting process, meant to ensure the guarantees of the Fourteenth and Fifteenth Amendments, may disappear." H.R. Rep. No. 102-655, at 3 (emphasis added). Certainly the "discrimination . . . encountered by these minority language populations" that the Voting Rights Act was enacted to remedy includes fraud perpetrated on minority language voters at all stages of the electoral process. *Id.* The Voting Rights Act should serve to prevent the class of fraud that occurred in this case.

We cannot catalogue every deceptive method used by signature gatherers. But when we have identified one of their methods — lying to minority-language speakers about the content of recall petitions — we should not tolerate it. As a broad *remedial* provision, section 203 should not be a tool to help recall or initiative proponents perpetrate deception.

## V.   Chilling Effect

The majority and Defendants speculate about a hypothetical chilling effect that requiring petitions to be translated would have on petition proponents. Maj. Op. at 11562-63. Increased costs, however, are a secondary concern in the realm of the Voting Rights Act. Certainly Congress knew there would be costs of translation when it enacted section 203. But that is a necessary cost if we truly desire to include all eligible voters in the electoral process. In amending the Voting Rights Act, Congress was responding to a history of language discrimination in voting. It did not suggest that its remedy should be undermined because there might be an increased financial burden on states or political subdivisions. *See* 42 U.S.C. § 1973aa-1a. Such translation costs are a burden we must bear as members of a diverse, multilingual society.

Further, it is not clear to me that the costs of translation would actually deter groups from circulating their petitions. The statement on a recall petition is subject to a maximum of 200 words. *See* Cal. Elec. Code § 11020(b). I find it hard to believe that the "expense and trouble" of translating 200 words would be enough to discourage recall proponents. Moreover, states or political subdivisions subject to section 203 are necessarily areas with significant minority language populations and already have systems in place through which other voting materials are translated. I do not believe that a slightly increased financial burden should outweigh the right of every voter to participate in the electoral process, or that this is a sufficient reason to justify leaving limited-English proficient voters in the dark about the petitions they are solicited to sign. In short, I am not swayed by an unseen and unproven chilling effect that a petition translation requirement would cause.

### CONCLUSION

"[T]he purpose of the bilingual provisions of the [Voting Rights] Act is to end the language disability of some citizens

to full participation in the electoral process; and to this end, the Act requires information relating to the electoral process to be brought to their attention in both English and the minority language." *Zaldivar*, 780 F.2d at 833. Holding that these bilingual provisions do not apply to recall petitions denies minority language speakers the right to fully participate in the electoral process by depriving them of the ability to consider the written arguments for and against a particular recall target. Such a result runs counter to the very purpose of Congress in remedying minority language discrimination in voting. Accordingly, I believe that section 203 of the Voting Rights Act must apply to recall petitions circulated pursuant to California law. I therefore dissent.